No. 2--00--1363
_________________________________________________________________

 IN THE

 APPELLATE COURT OF ILLINOIS

 SECOND DISTRICT
_________________________________________________________________

LOWE EXCAVATING COMPANY, ) Appeal from the Circuit Court
) of McHenry County.
 Plaintiff-Appellant and )
 Cross-Appellee, )
 )
v. ) No. 88--CH--034
 )
INTERNATIONAL UNION OF )
OPERATING ENGINEERS LOCAL )
No. 150 and ROBERT DARLING, )
 ) Honorable
 Defendants-Appellees and ) Michael J. Sullivan,
 Cross-Appellants. ) Judge, Presiding.
_________________________________________________________________

 Modified Upon Denial of Rehearing

 JUSTICE McLAREN delivered the opinion of the court:

 The following facts are taken from the record. Plaintiff, Lowe Excavating Company, is an
Illinois corporation engaged in excavating and site preparation services since 1969. Marshall Lowe
was the president of Lowe at the time of the incidents at issue. Defendant International Union of
Operating Engineers Local No. 150 (the Union) is a labor organization doing business in McHenry
County. Defendant Colin "Robert" Darling was a business agent employed by the Union at the time of
the incidents at issue.
 On February 15, 1988, the Union began picketing at a Lowe project site, known as Ballashire
Hall, with signs stating:
 "NOTICE TO THE PUBLIC
 LOWE EXCAVATING DOES NOT PAY THE PREVAILING
 WAGES AND ECONOMIC BENEFITS FOR
 OPERATING ENGINEERS WHICH ARE
 STANDARD IN THIS AREA
 OUR DISPUTE CONCERNS ONLY SUBSTANDARD
 WAGES AND BENEFITS PAID BY THIS COMPANY
 LOCAL 150
 International Union of
 Operating Engineers, AFL-CIO"
 On February 17, 1988, Lowe filed a complaint seeking a temporary restraining order (TRO),
preliminary and permanent injunctions, and damages. The following day, the Union filed a petition
for removal to the United States District Court, arguing that Lowe's claim seeking an injunctive
relief was preempted by federal law. On June 10, 1988, the United States District Court for the
Northern District of Illinois denied the Union's petition and remanded the case to the state trial
court, stating that "Lowe's complaint does not on its face contain a federal claim."
 On June 30, 1988, the trial court enjoined the Union from picketing Lowe in McHenry County
until the court ruled on Lowe's request for a preliminary injunction. On August 11, 1988, the trial
court dismissed Lowe's second amended complaint based on the Union's claim that the court lacked
subject matter jurisdiction due to federal preemption. The court granted Lowe leave to file a third
amended complaint.
 On September 28, 1988, the Union resumed picketing. The following day, Lowe filed a third
amended complaint seeking a temporary restraining order, preliminary and permanent injunctions, and
damages. Lowe also filed a motion for a temporary restraining order, preliminary injunctions, and
the reconsideration of the dismissal of the second amended complaint based on the lack of subject
matter jurisdiction. The court again enjoined the Union from picketing Lowe until the court's
ruling on Lowe's request for a preliminary injunction. On October 6, 1988, the Union filed a motion
to dismiss this third amended complaint, again asserting that, based on federal preemption, the
trial court lacked subject matter jurisdiction.
 On October 11, 1988, the court partially granted Lowe's motion for a temporary restraining
order enjoining the Union from "picketing or otherwise disseminating the fact that Lowe is non-
union." The court also denied the Union's motion to dismiss Lowe's third amended complaint and
denied Lowe's "request for preliminary injunctive relief relating to area standards, in reckless
disregard for the truth," based on federal preemption grounds. Lowe filed an interlocutory appeal
of this decision.
 On March 3, 1989, this court reversed the trial court's decision and remanded the case for a
hearing. Lowe Excavating Co. v. International Union of Operating Engineers Local No. 150, 180 Ill.
App. 3d 39 (1989).
 The trial on Lowe's third amended complaint began in April 2000. The four claims proceeding to
trial against the Union and Colin Darling, as an individual, were count II, alleging tortious
interference with contractual relationship; count IV, alleging tortious interference with
prospective economic advantage; count V, alleging trade libel; and count VI, alleging negligent
interference with contract.
 At the trial, Darling testified that late in the summer or early in the fall of 1987 he spoke
with two Lowe employees, Hartzell Zimmerman and Pasqual Gebbia. Zimmerman and Gebbia told Darling
what they were making at the time and what benefits they received. Darling stated that the men
showed him their pay stubs and that these were the only pay stubs Darling saw. However, during a
deposition in 1994, Darling stated that he had not seen pay stubs. Darling explained at trial that
his memory was better at trial in April 2000 than it was when he gave his deposition.
 Darling also testified that in February 1988 the class one (top wage) under the Union's master
collective bargaining agreement was $19.40 an hour to be increased to $20.10 an hour on June 1,
1988, and the class two wage was $18.85 an hour. These were the wages that were appropriate for the
Ballashire Hall project. The contribution to various fringe benefit funds was $2.20 an hour. Also,
the master agreement provided that no more than 1 apprentice was permitted on a job with less than 7
journeymen, 2 apprentices for between 7 and 13 journeymen, and 3 apprentices for between 13 and 22
journeymen.
 In October 1987 the Union initiated efforts to unionize Lowe’s employees. Marshall Lowe
arranged for representatives of the Union to met with Lowe employees. At the meetings, the Union
and Lowe presented the employees with comparisons of their respective wages and benefits.
 Darling testified that, during a meeting with Marshall Lowe in December 1987 or January 1988,
Marshall provided several documents, including Lowe’s 401(k) pension plan, profit-sharing plan, and
payroll information. Darling gave these documents to the Union’s fund administrator, Larry
Bushmaker. Darling talked to Union president Bill Dugan about Zimmerman's and Gebbia's claims that
they were not getting area standard wages. Darling never asked anyone to investigate Lowe's wages
and benefits paid after the summer of 1987. Early in 1988 Dugan and his assistant, Bill Anderson,
and Darling decided that the Union should picket Lowe. Darling stated that, after the initial
pickets began, Marshall told Darling that Lowe had a federally funded project but would not tell
Darling where the project was.
 Marshall Lowe testified that on February 12, 1988, he sent the Union’s fund administrator,
Bushmaker, a letter notifying Bushmaker that another employee meeting was scheduled for March 12,
1988, so that Bushmaker could explain the Union’s fringe benefits to Lowe’s employees. However,
Bushmaker never responded to this letter, and the meeting did not take place.
 On February 12, 1988, Lowe was read a mailgram from the Union over the phone, which stated in
part:
 "Local 150, International Union of Operating Engineers is informed that your company is
 currently performing construction work at Canterbury Place Retirement Community. Local 150 has
 attempted to make careful investigation of your company’s policies regarding the payment of
 area standards to individuals performing construction work at this project. We have determined
 that the area standards for the operating engineers are not being met at this project. If our
 information regarding this fact is incorrect, please advise us immediately."
 Darling testified that after the Union sends notice that it intends to picket it waits 48
hours so that the contractor can prove that it pays prevailing wages. However, Darling stated that
this requires "solid evidence" like "an audit" before it will decide not to picket.
 In response to the Union's mailgram, Marshall Lowe sent the Union a mailgram on February 15,
1988, stating that "we are paying the area standards and in fact are paying higher wages and fringes
to our men." Marshall Lowe was shocked by the Union's mailgram because Marshall had been congenial
to the Union, providing it access to his employees and their telephone numbers. Further, Marshall
had told Darling what he was paying his employees.
 Nevertheless, at 6 a.m. on February 15, 1988, the Union began picketing at Lowe's project at
Ballashire Hall. The Ballashire Hall project involved the construction of a nursing home as part of
a larger retirement community project called Canterbury. FAMCO was the general contractor for both
projects.
 Ballashire Hall was a federally funded construction project of the federal Department of
Housing and Urban Development (HUD). Employers on HUD projects are required by federal law to pay
their employees the prevailing area wage and benefits established by the United States Secretary of
Labor. 40 U.S.C.A. §267a (West 1982) (the Davis-Bacon Act).
 Darling testified that he knew that the failure to pay prevailing wages on a federal project
was a crime. Darling also knew that Lowe was working on other projects at the time, but he chose to
picket the Ballashire Hall site because it was a large one, he was familiar with it, and he knew
that Lowe was working on a foundation there. Darling used the Union's preprinted area standards
picketing signs and simply added the name "Lowe Excavating." Darling received Lowe's mailgram
response on February 15, 1988, at his home but did not respond because he was "not supposed to talk
to anybody" because it was not part of his job to do so. Darling stated that the only information
he had about Lowe's wages came from Zimmerman and Gebbia.
 Bradley Brei, president of FAMCO, the general contractor of the Ballashire Hall project,
testified that he approached Darling on February 15, 1988, while Darling was picketing at the site.
Brei told Darling that Brei had "already filed certified payrolls with HUD that Lowe was paying
prevailing wage rates and [he] could not understand on what the basis was that he was there or why
the pickets were there [sic]." Brei asked Darling, "[H]ow can you picket on a basis that he's not
paying prevailing wage rates when they've been certified?" Brei stated that if he turned in false
payroll records he would be subject to a federal penalty.
 Darling testified that he responded to questions by Brei and Al Woods, another FAMCO
representative, by telling them to read the picket sign. Darling also told Brei that the only way
the picket signs would be removed was if Lowe was removed from the Ballashire Hall job.
 Brei testified that, after speaking with Darling on the picket line, Brei went to his
construction trailer and called Marshall Lowe and asked Marshall to remove his people from the site.
 Lowe's employees left the Ballashire Hall project site an hour or two later. However, the pickets
did not come down. Darling told Brei that Lowe's equipment also had to be removed. Brei stated
that even after the equipment was removed the picketing continued "[f]or a period of time."
 Marshall Lowe testified that both Lowe's employees and equipment were off the Ballashire Hall
project site by 11 a.m. on February 15, 1988. Marshall testified that he knew that Lowe was
required to pay prevailing wages at the Ballashire Hall project under the penalty of perjury.
Further, Lowe sent certified payrolls for January 1988 to HUD. Marshall stated that Ballashire Hall
was the first project for which Lowe paid prevailing wages. Prevailing wages for that project were
an hourly rate of $18.60 for class one equipment and $5.55 for benefits. Marshall stated that there
was a tremendous amount of work left to be done at the Ballashire Hall project when Lowe was
removed, including the sewer work, digging and excavating the foundation, putting fill on the inside
of the slab, grading around the building, the parking lot, and gravel and finish grading. Marshall
testified that Lowe's removal from the Ballashire Hall project resulted in $4,680 in lost profits
(Lowe's profit margin was 18%).
 Lowe employee Michael Dobler testified that he worked at the Ballashire Hall project site
during the picketing. Dobler stated that all of Lowe's equipment had been removed from the site on
the first day of picketing, February 15, 1988. Dobler stated that the picketing continued on
February 16 and 17, 1988. On his way to work at 6:30 a.m. on February 17, 1988, Dobler saw
picketers at the site carrying the same signs they carried on the prior two days. Dobler did not
see the picketers later that day at 3:30 p.m. when he drove past the site.
 Darling contradicted Marshall's testimony, saying that Lowe's equipment was not removed until
the following day, February 16, 1988. Darling also contradicted Dobler, stating that the picketing
stopped on February 16, 1988. Darling stated that he returned to the site on February 17, 1988, but
he denied that the pickets were up on that day. Darling stated that after the February picketing
Darling met Marshall at a restaurant and Marshall told Darling that Lowe had a federally funded
project but Marshall would not reveal where it was.
 Frank Stampler, a certified public accountant (CPA), testified that in April 1988 he and two
other CPAs audited Lowe's wages and benefits for the period of January 13, 1988, to February 16,
1988. Stampler compared Lowe's wages and benefits to those required by the United States Department
of Labor. Stampler stated that for the period of January 13, 1988, to February 16, 1988, Lowe's
employees at the Ballashire Hall project were paid over the federal prevailing wage rate, including
any apprentices on the site. Stampler stated that the prevailing rate is composed of the hourly
individual wage and benefits added together. The allocation to the profit-sharing plan of each
Lowe's employee was made at the end of each year and was based on certain factors. However,
Stampler concluded that Lowe's operators were paid "in excess of the prevailing rate" at the
Ballashire Hall project in 1988.
 John P. O'Hagan, president of Human Resources Planning Associates, testified that, early in
the spring or summer of 1987, and again early in 1988, at Marshall's request, he compared Lowe's
benefits to the Union's. O'Hagan concluded that Lowe's health insurance plan provided more
comprehensive and broader coverage than the Union's. Regarding disability benefits, O'Hagan opined
that the two plans were different, but O'Hagan did not say that one plan was better than the other.
Lowe's life insurance benefits were superior to the Union's.
 In March 1988, the Congress of Independent Unions (CIU) was certified as the representative of
Lowe's employees. On August 15, 1988, the CIU and Lowe entered into a collective bargaining
agreement that provided that Lowe would pay prevailing wages, retroactive to April 15, 1988. R.
Richard Davis, vice-president of the CIU, testified that, at all relevant times, the CIU contract
base rate was higher than the prevailing wage. However, Davis acknowledged that the Union employees
received a wage increase every June, while under the CIU contract, Lowe employees did not receive
their wage increase until April of the following year, 10 months later than the Union employees.
Thus, from June 1988 to April 1989, Lowe employees would earn $.70 less than the Union employees.
 Darling and the Union began picketing again at the Ballashire Hall project site in September
1988, where Lowe was once again working. Darling knew that Lowe was working on the federal part of
the Canterbury project at that time. The picketers used the same signs that were used in February.
By the summer of 1988, Darling knew the Ballashire Hall project was federally funded. Before the
September picketing, Marshall Lowe told Darling that Lowe was paying prevailing wages. On September
28, 1988, Darling received a mailgram from Lowe stating that Lowe was withdrawing from the
Ballashire Hall project. The same day, Darling received a second mailgram from Lowe stating that it
was paying area standards and that it was setting up a second gate to allow union contractors to
enter the site without crossing the picket line.
 Marshall testified that, after Lowe was removed from the FAMCO job in September 1988, Lowe did
not work with FAMCO again for five or six years. The trial court did not permit Lowe to admit
evidence that it lost $125,000 of work at an 18% profit ($18,750 lost profit) caused by its removal
from the Ballashire Hall project in September 1988.
 Brei testified that he was frustrated with Marshall "that he didn't get his house in order."
Brei again removed Lowe from the project and replaced Lowe with another contractor to put in the
parking lot and perform the grading. However, the Canterbury project was never completed because
the developers did not obtain full occupancy.
 At the close of Lowe's case, the trial court granted a directed finding in favor of Colin
"Robert" Darling, as an individual, as to all counts of Lowe's third amended complaint. The court
also granted a directed finding in favor of the Union as to the claim for negligent interference
with contractual relationship and on all counts as to the damage issue.
 The trial court granted Lowe's motion to conform its pleadings to the evidence presented at
trial.
 The trial court refused to allow Lowe to present evidence of its attorney fees as a measure of
punitive damages, but it allowed Lowe to submit an affidavit as an offer of proof that it had
incurred more than $100,000 in fees.
 After hearing the evidence and arguments, the trial court found in favor of the Union on all
counts. The court found that count V, the trade libel count, was not proved by Lowe because Lowe
failed to prove by clear and convincing evidence that the Union’s statements were false, that the
Union made these statements knowing them to be false or with reckless disregard of whether the
statements were true or false, or that the Union was given information before it began to picket
that the Ballashire Hall and Canterbury projects were federally funded. The trial court also ruled
in the Union’s favor on the remaining counts, reasoning that there was insufficient proof to
establish the remaining counts for interference torts because the Union’s qualified privilege
defeated these other claims.
 Lowe filed a timely notice of appeal, and the Union and Darling filed a timely notice of cross-
appeal.
 We first address Lowe's motion to strike the Union's entire brief. Lowe contends that the
Union attempted to improperly supplement the record on appeal by including documents and matters not
before the trial court in the appendix to the Union's response brief and in the argument contained
in the Union's response brief. The Union filed a motion to supplement the record with this material
consisting of transcripts from the federal court proceedings. The Union argues that this material
was presented to the trial court. Having carefully reviewed the record on appeal, this court now
denies both motions. Supreme Court Rule 329 provides in part that "[a]ny controversy as to whether
the record accurately discloses what occurred in the trial court shall be submitted to and settled
by that court and the record made to conform to the truth." 134 Ill. 2d R. 329. Here, the Union
asks this court to settle this controversy. We are not in a position to know what occurred in the
trial court absent support in the record before us. The record before us does not establish that
the material at issue was before the trial court. Therefore, we deny the Union's motion. See
Anderson v. Financial Matters, Inc., 285 Ill. App. 3d 123, 130 (1996). Thus, we will disregard any
material contained in, or attached to, the Union's brief that is not contained in the record
prepared for appeal, but we deny Lowe's motion to strike the Union's brief and appendix.
 Lowe argues on appeal that the trial court erred by shifting the burden of proof to Lowe
regarding the falsity of the Union’s statements and the Union’s knowledge of the falsity of the
statements or reckless disregard of whether the statements were true or false. Lowe also argues
that the trial court erred by finding in the Union’s favor on the trade libel count.
 In reviewing a bench trial, we defer to the trial court's factual findings unless they are
against the manifest weight of the evidence. Wildman, Harrold, Allen & Dixon v. Gaylord, 317 Ill.
App. 3d 590, 599 (2000). We will not substitute our judgment for that of the trial judge as to the
credibility of the witnesses and conflicts in the testimony. Wildman, 317 Ill. App. 3d at 599.
However, we review a question of law de novo. Hendricks v. Riverway Harbor Service St. Louis, Inc.,
314 Ill. App. 3d 800 (2000).
 In the first appeal in this case, Lowe Excavating Co. v. International Union of Operating
Engineers Local No. 150, 180 Ill. App. 3d 39 (1989) (hereinafter Lowe I), this court held that
Lowe’s trade libel claim must be evaluated under the New York Times Co. v. Sullivan, 376 U.S. 254,
11 L. Ed. 2d 686, 84 S. Ct. 710 (1964), standards applied in Linn v. United Plant Guard Workers of
America, Local 114, 383 U.S. 53, 65, 15 L. Ed. 2d 582, 591, 86 S. Ct. 657, 664 (1966), and followed
by Krasinski v. United Parcel Service, Inc., 124 Ill. 2d 483 (1988). Lowe I, 180 Ill. App. 3d at
48. Under this standard, a plaintiff must prove actual malice, that is, that the defendant
published defamatory statements "with knowledge of their falsity or with reckless disregard of
whether they were true or false." Linn, 383 U.S. at 65, 15 L. Ed. 2d at 591, 86 S. Ct. at 664.
Reckless disregard for the truth includes publishing statements while defendant entertains serious
doubts as to the truth of the statements. Pease v. International Union of Operating Engineers Local
150, 208 Ill. App. 3d 863, 872 (1991). The plaintiff must prove actual malice by clear and
convincing evidence. Kessler v. Zekman, 250 Ill. App. 3d 172, 188 (1993). To recover damages, the
plaintiff must also prove harm resulting from the defamatory statements. Linn, 383 U.S. at 66, 15
L. Ed. 2d at 591, 86 S. Ct. at 664. In addition, despite plaintiff's contention to the contrary, a
plaintiff also must prove that the statements at issue were false. Krasinski, 124 Ill. 2d at 490.
Lowe's citation to Lowe I to support its argument that it does not need to prove the falsity of the
statements is misplaced. In Lowe I, this court's statement, "[t]he underlying issue in this case is
not whether plaintiff paid wages sufficient to meet area standards" (Lowe I, 180 Ill. App. 3d at 47-
48), was made to establish that the issue was not preempted by federal law. This statement does not
relieve Lowe from its obligation to prove that the statements were, in fact, false. Lowe ignores
the following declaration of this court: "While truth or falsity is an important element in the tort
of trade libel, it is certainly not the only issue to be considered." Lowe I, 180 Ill. App. 3d at
48.
 Accordingly, in this case, we must first determine whether the statements at issue were
defamatory. There are two types of defamatory statements, defamation per se and defamation per
quod. Bryson v. News America Publications, Inc., 174 Ill. 2d 77, 88, 103 (1996). Ordinarily, when
a statement is defamatory per se, damages are presumed, and when a statement is defamatory per quod,
the plaintiff must prove special damages. Bryson, 174 Ill. 2d at 88, 103. However, in this case,
Lowe must prove damages regardless of which category applies to the Union's statements. See Linn,
383 U.S. at 66, 15 L. Ed. 2d at 591, 86 S. Ct. at 664. A statement is defamatory per se if the
words used are obviously harmful to the plaintiff's reputation because they impute to the plaintiff
the commission of a criminal act, the lack of ability in a person's performance of his profession or
business, or a want of integrity in the discharge of his office or employment. See Wynne v. Loyola
University of Chicago, 318 Ill. App. 3d 443, 451 (2000). Here, the harmful nature of the Union's
statements was not obvious but required knowledge of an extrinsic fact, that is, that the Ballashire
Hall project was federally funded. Therefore, the Union's statements do not fall under the
defamation per se classification.
 However, we do believe that the statements fall under the defamation per quod classification.
 A per quod claim applies when a statement is innocent on its face but extrinsic facts make the
statement defamatory or where a statement is defamatory on its face but does not fall into one of
the per se categories. Bryson, 174 Ill. 2d at 103. The statements the Union published declared,
"Lowe Excavating does not pay the prevailing wages and economic benefits for operating engineers
which are standard in this area." Certainly, if one knew, as FAMCO's Brei did, that the federally
funded Ballashire Hall project required Lowe, by law, to pay prevailing wages and benefits, the
Union's statements would be harmful to Lowe's reputation. Therefore, we determine that the
statements at issue here were defamatory.
 We must now address whether the trial court erred by finding that the statement made by the
Union, that "Lowe does not pay prevailing wages and economic benefits," was true. The following
facts were uncontroverted. The Ballashire Hall project was a federally funded job. Employers of
workers at federally funded jobs were required by federal law to pay prevailing wages. Marshall
Lowe, John O'Hagan, and Bradley Brei testified that Lowe paid its employees prevailing wages on the
Ballashire Hall project. Further, Lowe's payroll was certified. The Union’s only evidence that
arguably challenged this testimony established only that Lowe’s benefits did not match the Union’s
point by point and that its wage raises became effective 10 months after the Union’s. Although
there were differences in the benefits packages, the Union presented no evidence that Lowe did not
pay prevailing wages as a whole as required by federal law to its employees, including any
apprentices, at the Ballashire Hall project. Therefore, we determine that the trial court’s
finding, that Lowe did not prove the Union’s statements were false, is against the manifest weight
of the evidence.
 Lowe also argues that the trial court erred by finding that it did not prove that the Union
published the defamatory statements with actual malice. Lowe was required to prove by clear and
convincing evidence that the Union published defamatory statements "with knowledge of their falsity
or with reckless disregard of whether they were true or false." Linn, 383 U.S. at 65, 15 L. Ed. 2d
at 591, 86 S. Ct. at 664. Reckless disregard for the truth means that the defendant published the
statements while entertaining serious doubts as to the truth of the statements. Pease, 208 Ill.
App. 3d at 872. The following facts were uncontroverted. On the first day of picketing, Brei told
Darling that the Ballashire Hall project was a federally funded project, that Lowe's payroll had
been certified and sent to the Department of Labor, and that Lowe was paying prevailing wages for
that project. Therefore, at that time, Darling at least should have entertained serious doubts as
to the truth of the statements contained on the picket signs. Yet, the Union did not stop
picketing, at the earliest, until Lowe removed its employees and equipment from the site the
following day and its contractual relationship was terminated. Further, it picketed again in
September 1988. Thus, the undisputed facts establish that the trial court's finding of lack of
proof of actual malice is against the manifest weight of the evidence.
 The Union argues that the defamation claim is preempted by federal law. In Lowe I, this court
rejected this argument, deciding that the defamation claim was not preempted by federal law,
regardless of whether Lowe "paid wages sufficient to meet area standards." Lowe I, 180 Ill. App. 3d
at 47-48. Nothing in the Union's brief persuades us to revisit this issue or to alter the law of
the case.
 The Union also argues that Lowe's remaining claims for tortious interference with contract,
tortious interference with prospective business advantage, and negligent interference with contract
are preempted by federal law. Again, in Lowe I this court held that "the merits of the case are of
only peripheral concern to the NLRB [National Labor Relations Board]." Lowe I, 180 Ill. App. 3d at
47. Although we discussed cases involving claims of trade libel, we did not limit our holding to
Lowe's trade libel claim. Instead, we discussed the broader issue of "whether the National Labor
Relations Act (NLRA) deprives a State court of jurisdiction to enjoin a union from picketing with
placards that contain knowingly false statements, or statements made with reckless disregard for the
truth." Lowe I, 180 Ill. App. 3d at 43. Thus, our holding encompassed all of Lowe's claims, since
all of the claims were grounded in the same conduct. Accordingly, we need not revisit this issue or
alter the law of the case.
 We note that, in Lowe's notice of appeal to this court, it indicated that it was challenging
the trial court's memorandum of opinion and "partial directed verdict [sic]." However, the only
claim Lowe discusses in its brief is the claim for trade libel. In its reply brief, Lowe makes only
passing reference to the other claims of tortious interference with contract, tortious interference
with prospective economic advantage, and negligent interference with contract. However, Lowe made
no argument citing authority with respect to these claims. Lowe's passing reference to these other
claims without argument or citation to authority is insufficient to preserve this issue on appeal.
177 Ill. 2d R. 341(e)(7) (argument portion of brief "shall contain the contentions of the appellant
and the reasons therefor, with citation of the authorities and the pages of the record relied on"
and "[p]oints not argued are waived"). Accordingly, we express no opinion on the trial court's
rulings on these claims. See Miller v. Rosenberg, 196 Ill. 2d 50, 56 (2001).
 Next, Lowe argues that the trial court erred by excluding evidence regarding damages caused by
the Union's September 1988 picketing. The Union claims that the trial court's decision to exclude
this evidence was not an abuse of discretion. We agree with the Union. Supreme Court Rule 219(c)
authorizes a trial court to impose a sanction on a party who unreasonably fails to comply with the
court's discovery rules or orders. 166 Ill. 2d R. 219(c). We will not disturb a trial court's
decision to exclude evidence as a sanction absent an abuse of discretion. See In re Marriage of
Booher, 313 Ill. App. 3d 356, 359 (2000). To determine if a trial court abused its discretion by
issuing a sanction, we must consider the following factors: (1) the surprise to the adverse party,
(2) the prejudicial effect of the proffered evidence, (3) the nature of the evidence, (4) the
diligence of the adverse party in seeking discovery, (5) the timeliness of the adverse party's
objection to the evidence, and (6) the good faith of the party offering the evidence. No single
factor is determinative. Booher, 313 Ill. App. 3d at 359-60.
 Here, Lowe waited until the beginning of the trial to inform the Union that it was claiming an
additional $18,750 in damages caused by the September 1988 picketing. Lowe now explains that Brei's
lack of cooperation caused its delay in disclosing the amount of damages. Yet, Lowe acknowledges
that its counsel forgot to ask Marshall Lowe about the damages at issue, used figures that were
available 12 years earlier to calculate these damages, failed to subpoena Brei, and failed to
disclose the amount of the claimed damages despite the Union's prior requests. Further, the
admission of the proffered evidence during the trial did not leave the Union with time to verify
Lowe's claim, causing unfair prejudice to the Union. Therefore, we determine that the trial court
did not abuse its discretion by excluding the evidence regarding damages caused by the September
1988 picketing.
 Next, Lowe argues that the trial court erred by excluding evidence of its attorney fees as a
measure of punitive damages. Although punitive damages are generally disfavored because of their
penal nature, punitive damages may be awarded where, as here, the defendant committed a tort with
actual malice. See E.J. McKernan Co. v. Gregory, 252 Ill. App. 3d 514, 535-36 (1993). In addition,
this court has previously stated that a plaintiff's attorney fees may be included in the amount of
the award of punitive damages. See E.J. McKernan Co., 252 Ill. App. 3d at 536. However, in the
absence of a statutory provision authorizing an award of attorney fees, attorney fees cannot be
awarded as a separate entity distinct from punitive damages. E.J. McKernan Co., 252 Ill. App. 3d
at 546. Accordingly, the trial court abused its discretion by excluding evidence of Lowe's attorney
fees in support of its punitive damages claim. On remand, the trial court should consider this
evidence if it decides to award punitive damages.
 Finally, we address the Union's argument on cross-appeal. The Union argues that the trial
court erred in denying its petition for costs under section 5--118 of the Code of Civil Procedure.
735 ILCS 5/5--118 (West 1998). Section 5--118 provides for an award of costs to the prevailing
party in a civil case. 735 ILCS 5/5--118 (West 1998). However, with the determinations made in this
disposition, the Union is no longer the prevailing party. Therefore, the trial court's denial of
the Union's petition for costs is affirmed.
 For the foregoing reasons, we reverse the trial court's ruling in the Union's favor on the
trade libel count and its exclusion of evidence of Lowe's attorney fees for purposes of determining
punitive damages. We affirm the trial court's ruling in the Union's favor on Lowe's remaining
claims for tortious interference with contract, tortious interference with prospective business
advantage, and negligent interference with contract. We further affirm the trial court's exclusion
of the evidence of damages related to the September 1988 picketing and its denial of the Union's
petition for fees, and we remand this cause for further proceedings regarding damages.
 The judgment of the circuit court of McHenry County is affirmed in part and reversed in part,
and the cause is remanded.
 Affirmed in part and reversed in part; cause remanded.
 GROMETER and CALLUM, JJ., concur.