Docket Nos. 101231, 101347 cons..

# IN THE
# SUPREME COURT
# OF
# THE STATE OF ILLINOIS

INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL 150, Appellant and Cross-Appellee, v. LOWE EXCAVATING COMPANY, Appellee and Cross-Appellant.

*Opinion filed November 30, 2006.*

JUSTICE FITZGERALD delivered the judgment of the court, with opinion.

Justices Freeman, Kilbride, Karmeier, and Burke concurred in the judgment and opinion.

Justice Garman dissented, with opinion.

Chief Justice Thomas took no part in the decision.

## OPINION

This case involves litigation spanning 18 years between plaintiff, Lowe Excavating Company (Lowe), and defendant, International Union of Operating Engineers, Local 150 (the Union). In 1988, Lowe filed a multicount complaint against the Union in the circuit court of McHenry County, generally alleging that the Union picketed a Lowe work site with placards containing false information. After a bench trial, the trial court ruled in favor of the Union. The appellate court reversed, concluding that Lowe proved a cause of action for trade libel because the evidence showed that the Union made false

statements and the statements were made with actual malice. On remand, the trial court awarded Lowe $4,680 in compensatory damages and $525,000 in punitive damages. The appellate court reduced the punitive damages award to $325,000. 358 Ill. App. 3d 1034. We granted the parties' petitions for leave to appeal. For the reasons that follow, we reverse the judgment of the appellate court.

## BACKGROUND

Lowe is an Illinois corporation that performs excavating and site-preparation services. In February 1988, Lowe was performing excavation work at the Canterbury Place Retirement Community in McHenry County. Specifically, Lowe was working on a portion of the project known as Ballashire Hall, which was funded by the federal government through the Department of Housing and Urban Development (HUD). In order to obtain the contract on this project, Lowe had to certify its payroll with the federal government, and thus had to demonstrate that it was paying its employees prevailing wages and benefits established by the United States Secretary of Labor. 40 U.S.C. §276a (1982).

On February 15, 1988, the Union began picketing the Ballashire Hall site with placards stating:

"NOTICE TO THE PUBLIC

LOWE EXCAVATING DOES NOT PAY THE PREVAILING WAGES AND ECONOMIC BENEFITS FOR OPERATING ENGINEERS WHICH ARE STANDARD IN THIS AREA

OUR DISPUTE CONCERNS ONLY SUBSTANDARD WAGES AND BENEFITS PAID BY THIS COMPANY

LOCAL 150

International Union of Operating Engineers, AFL-CIO."

Lowe was ordered off the project by the general contractor as a result of the Union's picketing. On that same day, Lowe filed a complaint in the McHenry County circuit court seeking a temporary restraining order (TRO), preliminary and permanent injunctions, and damages. The complaint alleged a cause of action for tortious interference with a prospective economic advantage. The Union

-2-

promptly filed a petition for removal of the matter to federal court, asserting that Lowe's complaint sought relief for an unfair labor practice, which was a federal law issue. The federal court found that it did not possess subject matter jurisdiction over Lowe's cause of action and returned the cause to the circuit court.

Lowe subsequently amended its complaint to allege causes of action for trade libel, tortious interference with a contractual relationship, tortious interference with a prospective economic advantage and negligent interference with a contract. Lowe also continued to seek a TRO and further injunctive relief. The trial court granted Lowe's request for a TRO, but denied Lowe's request for other injunctive relief as being preempted by federal law. Lowe then filed an interlocutory appeal of the trial court's judgment. The appellate court concluded that the cause of action was not preempted by federal law and thus remanded the matter for the circuit court to review Lowe's motion for a preliminary injunction. *Lowe Excavating Co. v. International Union of Operating Engineers Local No. 150*, 180 Ill. App. 3d 39 (1989) (*Lowe I*). The Union filed a petition for leave to appeal to this court, which was denied. *Lowe Excavating Co. v. International Union of Operating Engineers*, 126 Ill. 2d 560 (1989) (table). The Union then filed a petition for a writ of *certiorari* to the United State's Supreme Court, which was likewise denied. *International Union of Operating Engineers, Local 150 v. Lowe Excavating Co.*, 493 U.S. 975, 107 L. Ed. 2d 502, 110 S. Ct. 499 (1989).

The matter proceeded to a bench trial in April 2000. At trial, the relevant evidence demonstrated that Lowe has been in business since 1969. Prior to 1988, Lowe employees were not unionized. In 1987, Colin Darling, a business agent for the Union, received information about the wages and benefits paid to Lowe employees from two individuals who were then employed with the company. That same year, the Union, at the invitation of Lowe's president, Marshall Lowe, met with Lowe employees, seeking to represent them for collective-bargaining purposes. Negotiations between the Union and Lowe stalled. Several months later, in February 1988, the Union decided to picket Lowe because it believed that the company was not paying area-standard wages. The decision to picket was made by Darling and

another Union employee without any further investigation into Lowe's wage or benefit packages.

On Friday, February 12, 1988, the Union sent Lowe a mailgram indicating that it would be picketing at Ballashire Hall because Lowe was not paying its operating engineers area-standard wages. Lowe sent a telegram back to the Union which stated: "We are paying area standards." The Union nevertheless began picketing the Ballashire Hall work site on the following Monday, February 15, 1988, at 6 a.m.

The Union claimed that it did not know that Ballashire Hall was a federally funded project when it began picketing. However, the evidence presented at trial demonstrated that the Union was quickly advised of this fact by Bradley Brei, the president of FAMCO, the company serving as the general contractor of the Canterbury Place project. Brei testified that, when the picketing started, he approached Darling and "I asked Mr. Darling why they were even there, that Ballashire Hall was a HUD project and that I had already filed certified payrolls with HUD that Lowe Excavating was paying the prevailing wage rates and I could not understand on what bases *** he was there or why the pickets were there." Despite this information, the Union continued picketing and did not cease until Brei ordered Lowe to discontinue its work and Lowe's equipment was removed from the site.

Lowe remained off the Ballashire Hall project until September 1988, when employees returned to do finishing work. Although the Union knew at that point, through Colin Darling, that Ballashire Hall was a federally funded project, it nevertheless picketed the work site. Lowe was removed a second time from the Ballashire Hall project by Bradley Brei. According to Marshall Lowe, the company suffered lost profits of $4,680 as a result of its removal from the Ballashire Hall project. Additionally, FAMCO declined to do business with Lowe for five to six years. Brei testified that he did not want to work with Lowe because he felt the company did not have its "house in order."

At trial, Lowe presented testimony from Frank Stampler, a certified public accountant, who stated that an audit of Lowe's wages and benefits for the period of January 13, 1988, through February 16, 1988, demonstrated that Lowe employees at the Ballashire Hall project were actually being paid more than the federal prevailing wage rate. Additionally, John O'Hagan, president of Human Resources

Planning Associates, a business which provides compensation, benefits and insurance planning services, testified that he compared Lowe's benefits with those of the Union in 1987 and 1988 at the request of Marshall Lowe. O'Hagan determined that Lowe's health and life insurance plans were superior to the those of the Union.

Marshall Lowe, however, admitted that, prior to August 1988, Lowe did not pay its employees prevailing wages and was not meeting the area standards for wages and employee benefits. Marshall Lowe specified that between 1969 and 1986, Lowe was not paying contract wage rates received by Union employees and did not offer a retirement plan for its employees. This practice changed when Lowe and the Congress of Independent Unions (CIU) entered into a collective-bargaining agreement in 1988, which provided that Lowe would pay prevailing wages at all times retroactive to April 15, 1988. Marshall Lowe added that the Ballashire Hall project was one of the first prevailing wage projects that Lowe ever worked on and, therefore, was one of the first times Lowe paid its employees the prevailing wage.

After hearing the evidence, the trial court ruled in favor of the Union on all counts. Lowe appealed, and the Union cross-appealed. The appellate court reversed the judgment of the trial court. *Lowe Excavating Co. v. International Union of Operating Engineers, Local No. 150*, 327 Ill. App. 3d 711 (2002) (*Lowe II*). The appellate court concluded that the statement appearing on the placards used by the Union in picketing Lowe constituted defamation *per quod*. *Lowe II*, 327 Ill. App. 3d at 722. The court determined that, after being told by Brei that Ballashire Hall was a federally funded project, that Lowe's payroll had been certified, and that Lowe was paying prevailing wages, "Darling at least should have entertained serious doubts as to the truth of the statements contained on the picket signs." *Lowe II*, 327 Ill. App. 3d at 723. Because the Union continued to picket even after possessing this information, the court determined that the Union acted with reckless disregard for the truth and, therefore, the defamatory statements made were made with actual malice. The appellate court rejected the Union's claim on cross-appeal that Lowe's defamation claim was preempted by federal law. *Lowe II*, 327 Ill. App. 3d at 723.

The appellate court then concluded that punitive damages could be appropriate in this case in light of its finding that the Union acted with actual malice. *Lowe II*, 327 Ill. App. 3d at 724. The appellate court thus directed the trial court to consider evidence of Lowe's attorney fees in the event that it decided to award punitive damages. *Lowe II*, 327 Ill. App. 3d at 725. The court cautioned, however, that attorney fees could not "be awarded as a separate entity distinct from punitive damages." *Lowe II*, 327 Ill. App. 3d at 725.

The Union sought leave to appeal from this court, and leave to appeal was denied. *Lowe Excavating Co. v. International Union of Operating Engineers, Local No. 150*, 199 Ill. 2d 557 (2002) (table). The Union then filed a petition for a writ of *certiorari* to the United States Supreme Court, which was likewise denied. *International Union of Operating Engineers, Local 150 v. Lowe Excavating Co.*, 537 U.S. 1028, 154 L. Ed. 2d 442, 123 S. Ct. 555 (2002).

Upon remand, the trial court first entered a judgment in favor of Lowe in the amount of $4,680 for actual damages sustained as a result of the Union's conduct. Lowe then filed a motion for punitive damages wherein it asserted that attorney fees plus expenses amounted to $506,659.78, and ultimately sought punitive damages of $5 million. The trial court accepted briefing from both parties on the issue of punitive damages and awarded punitive damages against the Union in the amount of $325,000. In doing so, the trial court specifically stated that punitive damages were appropriate in light of the appellate court's finding of actual malice. The court added that punitive damages were necessary to deter the Union from similar conduct in the future. The court then noted that, while the actual damages in this case were small, Lowe "incurred substantial attorney's fees and expenses in this protracted litigation." The court specified, however, that it was "not awarding attorney's fees."

The record shows that the court initially considered the fees of Lowe's attorney, Gerard C. Smetana, which, according to his affidavit, totaled $304,101.62. The trial court did not consider the fees of Smetana's cocounsel, Michael E. Avakian of the Center on National Labor Policy, Inc., as it did not appear that Lowe was responsible for payment of the $194,350 in fees and expenses incurred by Avakian and his organization. Lowe moved for reconsideration of the trial court's punitive damages award, asserting that the trial court

improperly ignored the fees incurred by Avakian. The trial court reconsidered and increased the punitive damages award to $525,000.

Both parties appealed. Neither party challenged the compensatory damages awarded, but both parties took issue with the award of punitive damages. The Union initially argued that punitive damages were inappropriate in this case. The appellate court disagreed, holding that punitive damages are available in defamation actions; that they were proper in this case because the Union acted with actual malice; and that the trial court imposed punitive damages for appropriate purposes, namely, punishing the Union for its malicious conduct and dissuading the Union from engaging in similar conduct in the future. 358 Ill. App. 3d at 1040-41 (*Lowe III*).

The Union next raised a common law challenge asserting that the punitive damages awarded were excessive. The appellate court rejected this claim, stating that "[n]othing in the record suggests that the trial court's award was the product of passion, partiality, or corruption." *Lowe III*, 358 Ill. App. 3d at 1041. The appellate court added that the trial court carefully considered the nature and enormity of the Union's misconduct and attempted to impose a sanction sufficient to deter the Union from similar offenses, while mindful of the amount of attorney fees incurred by Lowe. *Lowe III*, 358 Ill. App. 3d at 1041.

The Union further argued that the punitive damages awarded were unconstitutionally excessive in violation of the due process clause. The appellate court agreed, finding that the ratio of punitive damages to compensatory damages was approximately 115 to 1 and was therefore "exceedingly disproportionate." *Lowe III*, 358 Ill. App. 3d at 1044. The appellate court thus reduced the punitive damages award from $525,000 to $325,000, finding that "[s]uch an award *** results in a constitutionally acceptable ratio of approximately 75 to 1." *Lowe III*, 358 Ill. App. 3d at 1046. As a result of this finding, the appellate court did not address Lowe's contention that the amount of punitive damages awarded was insufficient. *Lowe III*, 358 Ill. App. 3d at 1046.

We allowed the parties' petitions for leave to appeal, and now consider whether the award fashioned by the appellate court was unconstitutionally excessive as urged by the Union, or whether the award was deficient, as urged by Lowe.

ANALYSIS

At the outset, we make clear that neither party contests the compensatory damages awarded in this case. Further, neither party is raising a common law challenge to the award of punitive damages. The issue in this case is whether the punitive damages awarded violate the due process clause of the fourteenth amendment, which prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor. See *State Farm Mutual Automobile Insurance Co. v. Campbell*, 538 U.S. 408, 416, 155 L. Ed. 2d 585, 600, 123 S. Ct. 1513, 1519-20 (2003).

## I. Standard of Review

The parties disagree as to the proper standard of review that should be used in reviewing this constitutional claim. Lowe asserts that an abuse of discretion standard should be applied and, in support, cites to *Franz v. Calaco Development Corp.*, 352 Ill. App. 3d 1129, 1138 (2004).

Lowe misstates the holding of *Franz*. Contrary to Lowe's assertions, the *Franz* court never used an abuse of discretion standard of review, under any circumstances, to determine the propriety of a punitive damages award. The *Franz* court did, however, provide a clear directive regarding the standard of review that should be used with respect to the constitutional claims raised herein. Citing *Cooper Industries , Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424, 149 L. Ed. 2d 674, 121 S. Ct. 1678 (2001), the court explicitly stated: "The standard of review for the constitutional question of whether a punitive damages award is excessive in violation of due process is indeed *de novo* \*\*\*." *Franz*, 352 Ill. App. 3d at 1147.

Also relying on the Supreme Court's decision in *Cooper*, as well as statements made by the Court in *State Farm*, the Union maintains that *de novo* review is proper in this case. In *Cooper*, the Supreme Court considered the proper standard of review in cases where punitive damages were alleged to be constitutionally excessive. In doing so, the Court acknowledged that the assessment of punitive damages was a form of punishment upon the wrongdoer and thus looked to jurisprudence in all areas of the law where "constitutional violations were predicated on judicial determinations that the

punishments were 'grossly disproportional to the gravity of ... defendant[s'] offense[s].' " *Cooper*, 532 U.S. at 434, 149 L. Ed. 2d at 686, 121 S. Ct. at 1684, quoting *United States v. Bajakajian*, 524 U.S. 321, 334, 141 L. Ed. 2d 314, 329, 118 S. Ct. 2028, 2036 (1998). The Court noted that cases of this ilk required "an independent examination" of the relevant information by reviewing courts. *Cooper*, 532 U.S. at 435, 149 L. Ed. 2d at 686, 121 S. Ct. at 1685. The Court further noted that the question of whether a punishment is constitutionally excessive " 'calls for the application of a constitutional standard to the facts of a particular case, and in this context *de novo* review of that question is appropriate.' "

The *Cooper* Court explored the reasons why *de novo* review was necessary under these circumstances. The Court explained that the concept of gross excessiveness is a "fluid concept[ ]" that cannot be precisely articulated. *Cooper*, 532 U.S. at 436, 149 L. Ed. 2d at 687, 121 S. Ct. at 1685, quoting *Ornelas v. United States*, 517 U.S. 690, 696, 134 L. Ed. 2d 911, 918, 116 S. Ct. 1657, 1661 (1996). Concepts of this nature acquire " 'content only through application' " and are best controlled and clarified through independent review. *Cooper*, 532 U.S. at 436, 149 L. Ed. 2d at 687, 121 S. Ct. at 1685, quoting *Ornelas*, 517 U.S. at 697, 134 L. Ed. 2d at 919, 116 S. Ct. at 1662. *De novo* review, under such circumstances, serves to " 'unify precedent' " and " 'stabilize the law.' " *Cooper*, 532 U.S. at 436, 149 L. Ed. 2d at 687, 121 S. Ct. at 1685, quoting *Ornelas*, 517 U.S. at 697-98, 134 L. Ed. 2d at 919-20, 116 S. Ct. at 1662. Finally, the *Cooper* Court explained that *de novo* review is beneficial because it provides citizens notice of conduct that will result in punishment and serves to assure the uniform treatment of individuals engaged in similar conduct:

> " 'Requiring the application of law, rather than a decisionmaker's caprice, does more than simply provide citizens notice of what actions may subject them to punishment; it also helps to assure the uniform general treatment of similarly situated persons that is the essence of law itself.' " *Cooper*, 532 U.S. at 436, 149 L. Ed. 2d at 687, 121 S. Ct. at 1685, quoting *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 587, 134 L. Ed. 2d 809, 834, 116 S. Ct.

-9-

1589, 1605 (1996) (Breyer, J., concurring, joined by O'Connor and Souter, JJ.).

In *State Farm*, the Supreme Court reiterated some of the principles set forth in *Cooper* and stated that *de novo* review was "mandated" when considering whether a punitive damage award was unconstitutionally excessive. *State Farm*, 538 U.S. at 418, 155 L. Ed. 2d at 601, 123 S. Ct. at 1520.

Lowe argues that *Cooper* and *State Farm*, and the cases upon which they relied, do not require that this court utilize a *de novo* standard of review because those cases involved punitive damages awarded by a jury instead of a judge after a bench trial. We find this distinction to be of no consequence. Whether punitive damages were awarded by a judge or jury has no impact on the reasons articulated in *Cooper* for applying a *de novo* standard, such as unification of precedent and stabilization of the law. Accordingly, we review the constitutional question before us *de novo*.

## II. Constitutionality of Punitive Damages Award

### A. *Excessiveness*

The Union first argues that the appellate court erred in affirming the trial court's punitive damages award, as the damages imposed are unconstitutionally excessive in violation of due process. Lowe counters that the appellate court erred in reducing the punitive damages award and asserts that it is entitled to a greater amount of punitive damages. Lowe adds that the reduced award is deficient because it will not serve to adequately punish the Union for its misconduct against Lowe or deter the Union from similar misconduct in the future.

The parties agree that the relevant test to determine whether punitive damages awarded are excessive was set forth in the United States Supreme Court's opinion in *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 134 L. Ed. 2d 809, 116 S. Ct. 1589 (1996), and recently reiterated in *State Farm*. In those cases, the Supreme Court instructed that three guideposts should be considered in reviewing an award of punitive damages: "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages

award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *State Farm*, 538 U.S. at 418, 155 L. Ed. 2d at 601, 123 S. Ct. at 1520, citing *Gore*, 517 U.S. at 575, 134 L. Ed. 2d at 826, 116 S. Ct. at 1598-99. We now consider each of these guideposts in reviewing the punitive damages award presently in dispute.

### 1. Degree of Reprehensibility

In *Gore*, the Supreme Court stated: "Perhaps the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." *Gore*, 517 U.S. at 575, 134 L. Ed. 2d at 826, 116 S. Ct. at 1599. Courts are instructed to consider the following factors when determining reprehensibility: (1) whether the harm caused was physical as opposed to economic; (2) whether the tortious conduct evinced an indifference to or a reckless disregard for the health and safety of others; (3) whether the target of the conduct was financially vulnerable; (4) whether the conduct involved repeated actions or was an isolated incident; and (5) whether the harm was the result of intentional malice, trickery, or deceit, or mere accident. *State Farm*, 538 U.S. at 419, 155 L. Ed. 2d at 602, 123 S. Ct. at 1521. Courts are further instructed that:

> "The existence of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award; and the absence of all of them renders any award suspect. It should be presumed a plaintiff has been made whole for his injuries by compensatory damages, so punitive damages should only be awarded if the defendant's culpability, after having paid compensatory damages, is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence." *State Farm*, 538 U.S. at 419, 155 L. Ed. 2d at 602, 123 S. Ct. at 1521.

The appellate court considered the factors set forth in *Gore* and *State Farm* in determining the Union's degree of reprehensibility. The court concluded that the reprehensibility of the Union's conduct was heightened by facts demonstrating that Lowe was financially vulnerable because it is a small business with only 16 employees and its reputation is very important to its continued success. The appellate

court specifically found that the Union's false allegations against Lowe were "potentially devastating" to Lowe's reputation and "could have financially ruined the company." *Lowe III*, 358 Ill. App. 3d at 1043. Further, the appellate court concluded that the Union's conduct was not isolated, because the Union picketed on more than one occasion and continued to picket even after learning that Ballashire Hall was a federally funded project and Lowe was required to pay prevailing wages. *Lowe III*, 358 Ill. App. 3d at 1043. Finally, the court reiterated its previous holding that the Union's conduct was the product of intentional malice. The court stated that the finding of malice was the "law of the case," and it declined to alter the holding in light of evidence demonstrating that the Union knew Lowe's payrolls had been certified by the Department of Labor. *Lowe III*, 358 Ill. App. 3d at 1043.

The Union maintains that the appellate court's findings were erroneous because none of the factors required to demonstrate reprehensibility were proven. Lowe disputes the Union's claim, but agrees that the first two reprehensibility factors do not weigh in its favor. Lowe concedes that the Union's conduct created a harm that was economic rather than physical and that the Union's conduct did not evince a reckless disregard or indifference to the health and safety of others. A dispute arises, however, with respect to the third reprehensibility factor–financial vulnerability. The Union maintains that the evidence presented at trial was insufficient to demonstrate that Lowe was financially vulnerable. Lowe asserts that the evidence demonstrated that it is a small business and this fact proves its financial vulnerability. Lowe also argues that evidence in the record demonstrates that the company had to "engage in odd jobs in the winter to stay afloat until it was recalled for work in the Spring."

Contrary to Lowe's contentions and the appellate court's findings, we conclude that the record in this case is devoid of evidence demonstrating that Lowe was financially vulnerable. Lowe claims that the record shows that it was forced to "engage in odd jobs" after the picketing. However, the portion of the record Lowe cites merely demonstrates that, some four to six years after the Ballashire Hall project, FAMCO contacted Lowe to perform snow removal work. Lowe cites to nothing in the record indicating that it was required to do such work to "stay afloat," as it now contends.

-12-

Further, the fact that Lowe is a "small business" does not, by itself, prove financial vulnerability. While we agree with the appellate court that small businesses often rely on reputation to maintain and attract customers, the evidence presented in this case demonstrated that Lowe temporarily lost only one customer, FAMCO, as a result of the Union's conduct. The evidence also demonstrated that Lowe operated as a nonunion company paying less than the prevailing wage rate for the area without incident from 1969 until 1988 when the Union picketed the Ballashire Hall site. There is no evidence that Lowe lost any other business as a result of the Union's conduct. Moreover, the only financial loss proven was the $4,680 in lost profits stemming from the Ballashire Hall project. Lowe provided no other financial information which would demonstrate its vulnerability.

We acknowledge that the United States Court of Appeals for the Third Circuit affirmed a finding by the United States district court that a "modest family-run business" was financially vulnerable without any evidence of its financial circumstances. See *Willow Inn, Inc. v. Public Service Mutual Insurance Co.*, 399 F.3d 224 (3d Cir. 2005). In *Willow Inn*, the court awarded punitive damages to the plaintiff after evidence demonstrated that the defendant insurer acted in bad faith and withheld payment on Willow Inn's property damage claim. In determining reprehensibility, the court found that Willow Inn was financially vulnerable based on evidence demonstrating that after being damaged by a tornado, the bar/restaurant was unable to afford professional help to clear away the rubble and initiate repairs. Instead, for 36 hours following the tornado, the owner and neighborhood volunteers worked to protect the building from further damage and clear away debris to make the surrounding area less hazardous. *Willow Inn*, 399 F.3d at 232. Lowe provided no evidence akin to that presented in *Willow Inn* which would demonstrate its financial vulnerability. Accordingly, we find that case to be readily distinguishable.

Lowe cites to *Planned Parenthood v. American Coalition of Life Activists*, 422 F.3d 949 (9th Cir. 2005), to support its assertion that it was financially vulnerable. In that case, the defendants threatened and attempted to intimidate several doctors who performed abortions. The federal appeals court for the Ninth Circuit held that the defendant's conduct was reprehensible in light of the physician's

-13-

financial vulnerability. Specifically, the court determined that the physician's livelihoods depended on their practices, and the defendants intentionally tried to scare the doctors into suspending their practices. In fact, one doctor stopped practicing because he feared for his life. *Planned Parenthood*, 422 F.3d at 958. Lowe argues that its livelihood and that of its employees depended on its ability to work, just as the doctors in *Planned Parenthood*. We find Lowe's comparison to be unpersuasive. In *Planned Parenthood*, the doctors' entire practice was negatively affected by the conduct of the defendants, and the doctors were afraid to perform a medical procedure which was the focus of their practices. In this case, Lowe was prohibited from working at one job site and temporarily lost the business of one customer. The record contains no evidence that Lowe lost other contracts or was unable to perform excavating work at other locations as a result of the Union's conduct. Accordingly, we conclude that the appellate court erred in finding that Lowe was financially vulnerable.

We now turn to the fourth reprehensibility factor–whether the Union's conduct constituted an isolated incident or a repeated act of misconduct. The appellate court concluded that the Union's conduct was repeated, finding that the Union picketed with false information from February 15, 1988, until June 30, 1988, and then again from September 28, 1988, until October 11, 1988. *Lowe III*, 358 Ill. App. 3d at 1043.

The Union asserts that the appellate court erred in considering picketing conducted at any time other than February 15, 1988. The Union maintains that in *Lowe II*, it was held liable for its conduct in February 1988 only and, therefore, its conduct on other dates should not have been part of the appellate court's determination in *Lowe III*. Lowe appears to agree that the appellate court's finding in *Lowe III* regarding periods of time between February and June 1988 and September and October 1988 was not based on the evidence, as Lowe discusses only two instances of defamation in its briefs. Specifically, Lowe cites to the Union's conduct beginning on February 15, 1988, and its conduct in September 1988 as evidence of repeated acts of misconduct.

A review of the appellate court's findings in *Lowe II*, as well as the evidence presented in the record and the parties' representations in their briefs, demonstrates that the Union falsely picketed Lowe at the

Ballashire Hall project on February 15, 1988. The Union then returned to the site on February 16, 1988, and picketed again for some portion of the day. There was testimony presented which indicated that the Union returned for a third time on February 17, 1988, but that testimony was not corroborated and was contradicted. Significantly, in their briefs, the respective parties do not treat the February picketing incidents as separate encounters, and Lowe does not argue that the Union's act of picketing on at least two, back-to-back days demonstrates recidivist conduct. Rather, Lowe points to the Union's act of returning to Ballashire Hall in September 1988 for picketing as evidence of the Union's repeated conduct. We note that there is no indication in the record, nor do the parties represent that the September picketing lasted for more than one day.

We also note that there is no indication in the record, nor do the parties argue, that the Union falsely picketed Lowe on any other occasions that those previously identified. Although the Union admits in its brief to picketing Lowe repeatedly at various work sites throughout 1988, there is no evidence suggesting that picketing at sites other than Ballashire Hall was false.

With these facts in mind, we are left to determine whether the Union's false picketing in February and September 1988 constitutes repeated conduct supporting a reprehensibility finding.

The Union argues that two instances of picketing falsely in February and September 1988 do not constitute a pattern of repeated malfeasance. In support, the Union points to federal jurisprudence which suggests that "repeated conduct" under the reprehensibility analysis is "not merely a pattern of contemptible conduct within one extended transaction ***, but rather specific instances of similar conduct by the defendant in relation to other parties." *Willow Inn*, 399 F.3d at 232. The Union maintains that no evidence was presented to demonstrate that it falsely picketed anyone other than Lowe and, therefore, its conduct cannot be construed as repeated malfeasance.

Lowe counters that the Union's conduct was repeated because it occurred on more than one occasion. Lowe maintains that the Union's "subsequent misconduct in September 1988" should be "counted" as evidence of recidivist behavior.

-15-

The repeated conduct factor of the reprehensibility test is grounded in the Supreme Court's opinion in *Pacific Mutual Life Insurance Co. v. Haslip*, 499 U.S. 1, 113 L. Ed. 2d 1, 111 S. Ct. 1032 (1991), one of the precursors to *Gore* and *State Farm*. In that case, the Supreme Court adopted certain factors that should be considered when determining whether a punitive damage award was excessive or inadequate. These factors include "the degree of reprehensibility of the defendant's conduct, the duration of that conduct, the defendant's awareness, any concealment, and the existence and frequency of similar past conduct." *Haslip*, 499 U.S. at 21, 113 L. Ed. 2d at 22, 111 S. Ct. at 1045.

In *Gore*, the Supreme Court considered whether BMW engaged in repeated misconduct when it routinely sold cars in the state of Alabama that had been slightly damaged and repaired as "new" without disclosing the damages and repairs to the customer. The Court determined that BMW could not be labeled a recidivist even though it engaged in similar conduct in other states because its disclosure policy was not considered fraudulent in those other states. *Gore*, 517 U.S. at 577-78, 134 L. Ed. 2d at 827-28, 116 S. Ct. at 1599-1600. Significantly, the Court reached this conclusion despite evidence demonstrating that a jury in a similar lawsuit had previously found that BMW's failure to disclose was fraudulent under Alabama law and awarded compensatory damages. *Gore*, 517 U.S. at 565, 134 L. Ed. 2d at 820, 116 S. Ct. at 1594. However, the Court stated:

> "Certainly, evidence that a defendant has repeatedly engaged in prohibited conduct while knowing or suspecting that it was unlawful would provide relevant support for an argument that strong medicine is required to cure the defendant's disrespect for the law. [Citations.] Our holdings that a recidivist may be punished more severely than a first offender recognize that repeated misconduct is more reprehensible than an individual instance of malfeasance." *Gore*, 517 U.S. at 576-77, 134 L. Ed. 2d at 827, 116 S. Ct. at 1599-1600.

*Gore*'s treatment of the repeated conduct factor demonstrates that recidivist conduct is to be considered reprehensible, and further demonstrates that court's may look outside the misconduct committed toward the plaintiff in question to other, similar conduct, when considering the recidivism factor.

-16-

In *State Farm*, the Supreme Court reaffirmed these principles. There, the Court considered whether the defendant insurer, which was found to have engaged in fraudulent insurance practices by improperly capping claim payments, was a repeat offender. The Court declined to label State Farm a recidivist for reprehensibility purposes because the plaintiffs were unable to present sufficient evidence of other conduct similar to that which injured them. *State Farm*, 538 U.S. at 423, 155 L. Ed. 2d at 604-05, 123 S. Ct. at 1523. Looking to *Gore*, the Court acknowledged that consideration of a defendant's similar, past conduct towards others was relevant to a determination of reprehensibility, but, where evidence of repeated misconduct of the sort that injured the plaintiffs in question is "scant," the conduct that actually harmed the plaintiffs "is the only conduct relevant to the reprehensibility analysis." *State Farm*, 538 U.S. at 423-24, 155 L. Ed. 2d at 605, 123 S. Ct. at 1523-24. The lesson gleaned from the analysis in *State Farm* is that courts may look externally, to a defendant's similar past conduct with respect to other parties, as well as internally, to a defendant's conduct towards the plaintiff in question, when considering recidivism.

Relying on *Gore* and *State Farm*, the United States District Court for the Third Circuit put this guideline into practice in *Willow Inn* when it looked to evidence of the defendant's similar misconduct in relation to other parties as well as the defendant's repetitive conduct towards the plaintiff in question to determine whether the defendant should be labeled a recidivist. In that case, the defendant insurance company was found to have improperly withheld insurance claim payments from the plaintiff. Although the court was disinclined to label the defendant a recidivist because there was no evidence presented which demonstrated that the defendant withheld payment of claims from other persons whom it insured, the court nevertheless gave some weight to the repeated conduct subfactor in determining punitive damages. The court stated: "[W]e consider this subfactor to be relevant, but with less force, insofar as the series of actions and inaction by PSM which delayed settlement of the claim *** implied a concerted effort to lessen PSM's expected payment on the claim." *Willow Inn*, 399 F.3d at 232-33.

Similarly, in *Williams v. ConAgra Poultry Co.*, 378 F.3d 790 (8th Cir. 2004), the Eighth Circuit found the defendant to have engaged in repeated racial discrimination against the plaintiff. In doing so, the

court looked to the plaintiff's testimony concerning instances in which he experienced racism, as well as the testimony of other ConAgra employees who described instances of discrimination that were factually similar to those described by the plaintiff. *ConAgra*, 378 F.3d at 798; see also *United States v. Veal*, 365 F. Supp. 2d 1034, 1039 (W.D. Mo. 2004) (where court found the defendant's conduct was recidivistic after evidence demonstrated that the defendant engaged in sexual harassment and discrimination against 11 different women and that the harm suffered by each woman was "severe and persistent").

Our appellate court's decision in *O'Neill v. Gallant Insurance Co.*, 329 Ill. App. 3d 1166 (2002), also provides guidance. The facts demonstrate that the defendant refused to even consider an offer to settle a claim resulting from an automobile accident where the policyholder was clearly negligent and the victim of the accident suffered severe and permanent injury. The defendant's conduct "turned $20,000 worth of contractual duty into a $3,010,063 judgment for a bad-faith refusal to settle" and exposed the policyholder to financial ruin. *O'Neill*, 329 Ill. App. 3d at 1168.

In determining whether the punitive damages awarded for the defendant's bad-faith refusal to settle were unconstitutional, the court considered the repetitive nature of the defendant's conduct. The court first looked to the defendant's conduct towards the policyholder and concluded that there was evidence of repetitive misconduct. The facts showed that defendant refused to respond to a settlement demand; ignored repeated advice and pleas from the policyholder, her attorneys and claims adjusters within the company to settle; employed unnecessary legal tactics to avoid paying the claim; and lied to and threatened the policyholder. *O'Neill*, 329 Ill. App. 3d at 1182-83. As the court summarized, "Gallant blatantly ignored its policyholder's financial security and did virtually nothing to protect her." *O'Neill*, 329 Ill. App. 3d at 1183. The court then looked to conduct that extended beyond the policyholder's case, and considered evidence revealing a pattern of conduct, over a five-year period, where the defendant's Illinois customers suffered excess judgments based on the defendant's refusal to settle within policy limits. *O'Neill*, 329 Ill. App. 3d at 1172, 1183. In light of this evidence, the court concluded that defendant's conduct was reprehensible and ultimately found that the punitive damages awarded were not unconstitutionally excessive. *O'Neill*, 329 Ill. App. 3d at 1185.

These cases demonstrate that courts are permitted to consider a defendant's conduct towards the plaintiff in question, as well as similar conduct extending beyond the plaintiff's case, when determining whether a defendant can be labeled a recidivist for reprehensibility purposes. Contrary to the Union's contentions herein, a court's consideration of recidivism should not be restricted to misconduct involving other parties unrelated to the case before the court. Thus, in applying the relevant analysis to the instant case, we find that the Union engaged in repeated acts of misconduct where the evidence demonstrated that it falsely picketed Lowe on more than one occasion in 1988. However, like the court in *Willow Inn*, "we consider this subfactor to be relevant, but with less force." *Willow Inn*, 399 F.3d at 232-33. While we certainly do not condone the Union's decision to continue to picket Lowe at Ballashire Hall after being advised that Lowe was paying the prevailing wage on the project, the fact remains that the Union falsely picketed Lowe at Ballashire Hall on two days in February 1998 and once in September 1988. There is no evidence before this court demonstrating that the Union falsely picketed Lowe, or anyone else, as a matter of course.

The defendants labeled recidivists in the cases reviewed herein each had a "pattern" of misconduct that typified the manner in which they did business. There is no evidence of a similar pattern of misconduct in this case. Accordingly, while we conclude that the Union's conduct was repeated for purposes of the reprehensibility analysis, we afford this factor little weight in our overall assessment of reprehensibility.

We now turn to the final reprehensibility factor and consider whether the harm to Lowe was the result of intentional malice, trickery or deceit, or mere accident. Before addressing the parties' arguments, we look again to the judgments of the appellate court on this issue. In *Lowe II*, the appellate court considered whether the Union published the defamatory statements about Lowe with actual malice, *i.e.*, " 'with knowledge of their falsity or with reckless disregard of whether they were true or false.' " *Lowe II*, 327 Ill App. 3d at 722, quoting *Linn v. United Plant Guard Workers of America, Local 114*, 383 U.S. 53, 65, 15 L. Ed. 2d 582, 591, 86 S. Ct. 657, 664 (1966). The appellate court recognized that "[r]eckless disregard for the truth means that the defendant published the statements while entertaining serious doubts as to the truth of the statements."

(Emphasis omitted.) *Lowe II*, 327 Ill. App. 3d at 722-23. The court then looked to the facts which demonstrated that Darling was told by Brei that Ballashire Hall was a federally funded project, that Lowe's payroll had been certified and sent to the Department of Labor, and that Lowe was paying prevailing wages. The court concluded that "Darling at least should have entertained serious doubts as to the truth of the statements contained on the picket signs," and later reiterated that "the defendant committed a tort with actual malice." *Lowe II*, 327 Ill. App. 3d at 723-24. In *Lowe III*, the appellate court stated that it "decline[d] to alter the law of the case with regard to the malice finding." *Lowe III*, 358 Ill. App. 3d at 1043.

Lowe now argues that we are bound by the law of the case, and therefore, must find that the Union acted with intentional malice. The Union agrees that we are bound by the law of the case, but asserts that the appellate court did not properly find actual malice. Instead, according to the Union, the appellate court made a finding of negligence by stating that "Darling at least should have entertained serious doubts as to the truth of the statements contained on the picket signs." Thus, the Union asserts that if we follow the law of the case, we must conclude that Darling's conduct was negligent rather than the product of intentional malice.

We disagree with the parties' interpretation of the law of the case doctrine. As this court explained in *Relph v. Board of Education of De Pue Unit School District No. 103*, 84 Ill. 2d 436, 442 (1981):

> "Even if the appellate court were bound by the law of the case it had announced in the first appeals, that limitation would not apply to this court. Although this court denied petitions for leave to appeal in both of the previous appeals of these cases, such action has no precedential effect and in no way amounts to a consideration of the merits of the cases. Nor does it indicate approval of the appellate court's action. [Citation.]. Therefore, this is the first time these cases have been before us on the merits. Our review may cover all matters properly raised and passed on in the course of litigation. [Citation.]"

See also *Garibaldi v. Applebaum*, 194 Ill. 2d 438, 447-48 (2000). Although this case has run the gamut of the appellate process in the past 18 years, this is our first opportunity to substantively review the

appellate court's finding of actual malice. Accordingly, we are not bound by the law of the case doctrine.

However, having reviewed the issue on the merits, we nevertheless agree with the appellate court's conclusion that the Union acted with intentional malice. The facts of this case demonstrate that Darling either knew that the statements contained on his picket signs were false or, at the very least, seriously doubted their veracity. Nevertheless, he chose to picket Lowe at the Ballashire Hall project, on two occasions, demonstrating a reckless disregard for the truth or falsity of the statements. We thus find that the Union acted with intentional malice and, therefore, its conduct can be characterized as reprehensible.

We note that our overall finding of reprehensibility rests mostly on only one of the five factors set forth in *Gore,* because, as previously explained, the repeated conduct factor lends marginal weight to a finding of reprehensibility based on the facts of this case. We are thus reminded of the Supreme Court's cautionary statement in *State Farm*: "The existence of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award." *State Farm*, 538 U.S. at 419, 155 L. Ed. 2d at 602, 123 S. Ct. at 1521; see also *Turner v. Firstar Bank, N.A.*, 363 Ill. App. 3d 1150, 1163-64 (2006) (where the court found that the presence of only one reprehensibility factor was insufficient to sustain a punitive damages award 20 times higher than the compensatory damages award); *Clark v. Chrysler Corp.*, 436 F.3d 594, 605 (6th Cir. 2006) (where court held that the presence of only one reprehensibility factor was insufficient to sustain a large punitive damages award).

2. Disparity Between Actual Harm and the Punitive Damages Award

Turning to the second *Gore* guidepost, we must consider the ratio between the actual harm suffered by Lowe and the punitive damages awarded. See *Gore*, 517 U.S. at 580, 134 L. Ed. 2d at 829, 116 S. Ct. at 1601; *State Farm*, 538 U.S. at 418, 155 L. Ed. 2d at 601, 123 S. Ct. at 1520. Lowe suffered $4,680 in actual damages and was awarded punitive damages of $325,000. The ratio between the actual harm and the punitive damages is approximately 75 to 1. The Union argues that this ratio is unconstitutional and unreasonable and, in support, cites several cases from other jurisdictions where punitive

damages exceeding a single-digit ratio were deemed unconstitutionally excessive and thus reduced. Lowe counters that the double-digit ratio was not excessive because the Union's conduct was particularly egregious and the monetary value of the noneconomic harm was hard to detect and difficult to determine. In fact, Lowe asserts that the punitive damages awarded by the appellate court were deficient, and urges that the amount of punitive damages awarded should be increased.

In considering whether a punitive damages award is constitutional, courts are instructed to consider whether there is a reasonable relationship between the punitive damages award and the potential and actual damages resulting from the defendant's conduct. *Gore*, 517 U.S. at 581, 134 L. Ed. 2d at 830, 116 S. Ct. at 1602. The Supreme Court has "consistently rejected the notion that the constitutional line is marked by a simple mathematical formula" (*Gore*, 517 U.S. at 582, 134 L. Ed. 2d at 830, 116 S. Ct. at 1602) and has declined "to impose a bright-line ratio which a punitive damages award cannot exceed." *State Farm*, 538 U.S. at 425, 155 L. Ed. 2d at 605, 123 S. Ct. at 1524. Nevertheless, the Court has cautioned that "in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *State Farm*, 538 U.S. at 425, 155 L. Ed. 2d at 605-06, 123 S. Ct. at 1524. The Court has also said that a punitive damages award of " 'more than 4 times the amount of compensatory damages' might be 'close to the line.' " *Gore*, 517 U.S. at 581, 134 L. Ed. 2d at 830, 116 S. Ct. at 1602, quoting *Haslip*, 499 U.S. at 23-24, 113 L. Ed. 2d at 23, 111 S. Ct. at 1046. The Court has, however, recognized that "because there are no rigid benchmarks that a punitive damages award may not surpass, ratios greater than those we have previously upheld may comport with due process where 'a particularly egregious act has resulted in only a small amount of economic damages.' " *State Farm*, 538 U.S. at 425, 155 L. Ed. 2d at 606, 123 S. Ct. at 1524, quoting *Gore*, 517 U.S. at 582, 134 L. Ed. 2d at 831, 116 S. Ct. at 1602.

In this case, the trial court originally awarded Lowe $325,000 in punitive damages. The trial court then reconsidered the award and raised it to $525,000 after being persuaded to consider additional attorney fees. Although the trial court stated on the record that it was not awarding attorney fees, the punitive damages award is very close

to the amount of attorney fees and expenses incurred by Lowe, which was reported to be $506,659.78.

The appellate court reviewed the award and found it to be unconstitutionally excessive. It thus reduced the award to $325,000, the amount originally granted by the trial court. In doing so, the appellate court acknowledged that the ratio between actual and punitive damages was in the double-digit range, but concluded that the ratio was appropriate because Lowe's reputation was injured and a small amount of compensatory damages was awarded. *Lowe III*, 358 Ill. App. 3d at 1044-45. The appellate court relied on three cases to support the proposition that higher ratios in the double-digit range are appropriate where the amount of compensatory damages is minimal. In *Routh Wrecker Service, Inc. v. Washington*, 335 Ark. 232, 980 S.W.2d 240 (1998), the court approved a 75 to 1 ratio where the plaintiff was awarded only $1,000 in compensatory damages. Similarly, in *Deters v. Equifax Credit Information Services, Inc.*, 202 F.3d 1262 (10th Cir. 2000), the court upheld a 59 to 1 ratio where the plaintiff was awarded $5,000 in compensatory damages. Finally, in *Jones v. Rent-A-Center, Inc.*, 281 F. Supp. 2d 1277 (D. Kan. 2003), the court upheld a 29 to 1 ratio where the plaintiff was awarded $10,000 in punitive damages.

We find the court's reliance on these cases to be misplaced. A review of the facts of those cases demonstrates that the high, double-digit ratios awarded to the parties were less the result of small compensatory damages awards and more the result of particularly egregious conduct which caused the plaintiffs great personal harm. For example, in *Routh*, the court awarded punitive damages that were 75 times higher than compensatory damages after hearing evidence demonstrating that the defendant wrongfully accused the plaintiff of stealing a car from the defendant's business and then swore out an affidavit for an arrest warrant knowing that the plaintiff did not steal the car. The plaintiff was subsequently arrested at his place of employment, handcuffed, booked and placed in a cell. The defendant did not drop the charges, but pursued them until they were ultimately dropped by the prosecution. *Routh*, 335 Ark. at 236, 980 S.W.2d at 242. The plaintiff was not only humiliated, he also suffered emotional and physical distress, including headaches and dramatic weight loss. *Routh*, 335 Ark. at 241, 980 S.W.2d at 244. The court concluded that the ratio of compensatory damages to punitive damages of 75 to 1

was appropriate in that case because the defendant's egregious and reprehensible conduct resulted in "extreme psychological pressure and turmoil." *Routh*, 335 Ark. at 242, 980 S.W.2d at 245.

Likewise, in both *Deters* and *Jones*, the plaintiffs were victims of extreme acts of sexual harassment in their respective workplaces. The *Deters* court found the 59 to 1 ratio of compensatory to punitive damages to be appropriate in light of the "particularly egregious" conduct of the defendants. *Deters*, 202 F.3d at 1273. The court added that a greater ratio is appropriate in cases where the injury suffered is "primarily personal" and noted that punitive damages awards are available in sexual harassment cases even in the total absence of compensatory damages. *Deters*, 202 F.3d at 1273. Relying on the rationale in *Deters*, the *Jones* court upheld a ratio of 29 to 1, citing the "personal" nature of the injury sustained by the plaintiff. *Jones*, 281 F. Supp. 2d at 1289-90.

The Union's conduct in the instant case is not comparable to the conduct of the defendants in *Routh*, *Deters* and *Jones*. Here, Lowe did not suffer a physical or emotional injury, and the injury sustained was not of a personal nature, as a corporation cannot be personally affronted. Lowe's injury cannot be compared to the humiliation suffered by individuals who endure sexual harassment in the workplace, and is also not comparable to the injury sustained by an individual who is arrested at his workplace for a crime he did not commit, handcuffed, and placed in a cell. While ratios ranging from 75 to 1 to 29 to 1 may have been appropriate under those circumstances, we cannot conclude that a ratio in that range is appropriate here where the Union's conduct was much less egregious.

We recognize that low compensatory damages awards may support higher ratios where a particularly egregious act has resulted in a small amount of economic damage, or where an injury is hard to detect and the harm is difficult to determine. See *Gore*, 517 U.S. at 582, 134 L. Ed. 2d at 831, 116 S. Ct. at 1602; *State Farm*, 538 U.S. at 425, 155 L. Ed. 2d at 606, 123 S. Ct. at 1524. In our estimation, the best way to determine whether a given ratio is appropriate is to compare it to punitive damages awards in other, similar cases. See *Romanski v. Detroit Entertainment, L.L.C.*, 428 F.3d 629, 646 (6th Cir. 2005). The parties have not cited a case squarely on point with the one before us, but we have found cases which provide some guidance on this issue.

In *Argentine v. United Steel Workers of America*, 287 F.3d 476 (6th Cir. 2002), the plaintiffs were elected officers of their union. They stridently criticized the defendant's conduct during contract negotiations and were thus removed from their positions by the defendant without due process. The defendant accused the plaintiffs of mishandling the union's funds and usurped the plaintiffs' elected authority without proper notice and hearing. The plaintiffs were awarded $9,406 in compensatory damages and $400,000 in punitive damages. The defendant argued that the punitive damages award was excessive under *Gore*. The court determined that the defendant's conduct was reprehensible because the defendant acted deliberately to violate the plaintiffs' free speech rights and harm their reputations for the defendant's own benefit. The court concluded that, although the compensatory damages were small "and without a ready monetary value," a ratio of 42.5 to 1 was reasonable. *Argentine*, 287 F.3d at 488.

In *Turner*, a case recently decided by our appellate court, the plaintiff was awarded $25,000 in compensatory damages for property stolen from her when her car was wrongfully repossessed by the defendant and $500,000 in punitive damages. The facts demonstrated that the defendant had a "systemwide" problem in its bill tracking system, and that it ignored the problem despite being aware that the system was only 50% accurate. The defendant's conduct resulted in "multiple wrongful repossessions" throughout a one-year period. *Turner*, 363 Ill. App. 3d at 1155. The plaintiff's car was wrongfully repossessed and she lost $25,000 worth of equipment which she stored in her car as a result. The plaintiff tried, with assistance of counsel, to obtain reimbursement from the defendant for these stolen items for nearly two years before she filed suit. During that time, even though plaintiff was able to provide documentation showing that she had paid off her car loan in full, the defendant reported her to three major credit bureaus and continued to report her for 3½ years.

### 3. Sanctions for Comparable Misconduct

*Gore* instructs us to consider the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases. See *Gore*, 517 U.S. at 583, 134 L. Ed. 2d at 831, 116 S. Ct. at 1603; *State Farm*, 538 U.S. at 428, 155 L. Ed. 2d at 607-08, 123 S. Ct. at 1526. The purpose of this guidepost

is to " 'accord substantial deference to legislative judgments concerning appropriate sanctions for the conduct at issue.' " *Gore*, 517 U.S. at 583, 134 L. Ed. 2d at 831, 116 S. Ct. at 1603, quoting *Browning-Ferris Industries of Vermont, Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 301, 106 L. Ed. 2d 219, 254, 109 S. Ct. 2909, 2934 (1989) (Brennan, J., concurring, joined by Marshall, J.). It is uncontested that no comparable Illinois law imposes a civil penalty, such as a fine, for defamation. As the legislature has not spoken on this issue, it is not necessary for us to further consider this guidepost. See *State Farm*, 538 U.S. at 428, 155 L. Ed. 2d at 608, 123 S. Ct. at 1526; see also *Turner*, 363 Ill. App. 3d at 1164-65 ("Neither party has presented any cases or statutes regarding this factor that are comparable in a meaningful sense to this case, nor is this court aware of any such cases or statutes. Accordingly, this guidepost is of minimal value in our assessment").

Before fashioning a punitive damages award in this case, we take note of the observations of the Seventh Circuit set forth in *Mathias v. Accor Economy Lodging, Inc.*, 347 F.3d 672 (7th Cir. 2003). There, the court pointed out several considerations that should be made in determining an appropriate compensatory to punitive damages ratio that are relevant to the case at bar. Specifically, the court cautioned that compensatory damages do not always "do the trick" in cases where the harm is largely dignatory because these damages may be too slight to give the victim an incentive to sue and are insufficient to deter and punish the defendant. *Mathias*, 347 F.3d at 677. Further, the court noted that an award of punitive damages can prevent a defendant from profiting from wrongful conduct. *Mathias*, 347 F.3d at 677. Finally, the court considered whether a defendant's wealth enables it to mount an extremely aggressive defense, making litigation too costly for a plaintiff and making it difficult for a plaintiff to find a lawyer willing to handle an involved case for modest stakes. *Mathias*, 347 F.3d at 677.

In addition to these considerations, we acknowledge that we are permitted to take into account the amount of the attorney fees expended in a case when assessing a punitive damages award. *Lowe II*, 327 Ill. App. 3d at 724-25, citing *E.J. McKernan Co. v. Gregory*, 252 Ill. App. 3d 514, 535-36 (1993). We also consider the need to achieve the goals of punishment and deterrence. *Gore*, 517 U.S. at 568, 134 L. Ed. 2d at 822, 116 S. Ct. at 1595; *State Farm*, 538 U.S.

at 416, 155 L. Ed. 2d at 600, 123 S. Ct. at 1519; *O'Neill*, 329 Ill. App. 3d at 1178-79.

With all of these principles in mind, we hold that a punitive damages award of $325,000, at a ratio of approximately 75 to 1, is unconstitutionally excessive in light of the Union's conduct in the instant case. We find that an award of punitive damages against the Union in the amount of $50,000, for a double-digit ratio of approximately 11 to 1, would be reasonable and constitutional. As our analysis demonstrates, the Union's conduct was minimally reprehensible, and the appellate court's award of punitive damages far exceeded awards given in other cases where the conduct exhibited was much more egregious. Furthermore, Lowe did not present evidence demonstrating that it sustained any injury to its reputation that extended beyond its strained and ultimately reconciled relationship with FAMCO. We cannot presume such damage, as the evidence does not warrant it. Indeed, the evidence shows that Lowe was a nonunion company paying less than the prevailing wage from 1969 until 1988. While Lowe's business decisions in this regard have no bearing on the issue before us, it stands to reason that companies that did business with Lowe were aware of its practices, and remained Lowe customers nonetheless.

We recognize that the $50,000 awarded here does not come close to covering the attorney fees and costs which were incurred throughout the duration of this protracted litigation. While attorney fees can be considered when awarding punitive damages, it is not within the purview of this court to award such fees outright, nor should they be awarded under the guise of a punitive damages award. *E.J. McKernan Co.*, 252 Ill. App. 3d at 546; *Anderson v. Ferris*, 128 Ill. App. 3d 149, 156 (1984). We have considered the cost of the litigation, as well as the goals of punishment and deterrence in fashioning the punitive damages award, and even after making those considerations, we find an award of $50,000 to be appropriate.


B. *Fairness*

The Union argues that any amount of punitive damages awarded to Lowe in the instant case are unconstitutional because the Union lacked notice that it was at risk for such a severe punishment. The Union maintains that no other court has imposed liability for

defamation based on false picketing and, therefore, the Union did not have fair notice that its conduct could result in a punitive damages award. The Union failed to raise this claim of unfairness below, and raises it for the first time in this appeal. Accordingly, it is forfeited. *Marshall v. Burger King Corp.*, 222 Ill. 2d 422, 430-31 (2006). However, we note that, even if we were to consider this claim, it would be deemed meritless, as it is well established that punitive damages can be awarded in defamation cases where a party, acting with actual malice, publishes false information about a person or entity. *Bryson v. News America Publications, Inc.*, 174 Ill. 2d 77, 109-10 (1996); *Edward v. Paddock Publications, Inc.*, 327 Ill. App. 3d 533, 566 (2001); *Krasinski v. United Parcel Service, Inc.*, 208 Ill. App. 3d 771, 773 (1991); *Winters v. Greeley*, 189 Ill. App. 3d 590, 599 (1989).

### III. Lowe's Claims

As previously stated, Lowe asserts in its cross-appeal that the punitive damages award of $325,000 fashioned by the appellate court was deficient and should be increased. We decline to address this claim in light of our decision herein.

### CONCLUSION

For the reasons stated, we reverse the judgment of the appellate court and affirm the judgment of the circuit court as modified by a reduction in the award of punitive damages from $325,000 to $50,000.

*Appellate court judgment reversed;*
*circuit court judgment affirmed*
*as modified.*

CHIEF JUSTICE THOMAS took no part in the consideration or decision of this case.

JUSTICE GARMAN, dissenting:

Because I believe the majority's decision in this case does not adequately vindicate the goals of punitive damage awards, I respectfully dissent. While the majority cites the goals of punishment and deterrence as informing its punitive award against the union, the resulting award of $50,000 does not achieve the purpose of those goals.

I agree with the majority's analysis and consideration of the guideposts for reviewing the constitutionality of an award of punitive damages set forth in *Gore* and further developed in *State Farm*. *State Farm Mutual Automobile Insurance Co. v. Campbell*, 538 U.S. 408, 418, 155 L. Ed. 2d 585, 601, 123 S. Ct. 1513, 1520 (2003), citing *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 575, 134 L. Ed. 2d 809, 826, 116 S. Ct. 1589, 1598-99 (1996). These guideposts are "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *State Farm*, 538 U.S. at 418, 155 L. Ed. 2d at 601, 123 S. Ct. at 1520. In considering these guideposts courts must keep in mind the underlying goals of punitive awards.

An award of punitive damages serves "to further a State's legitimate interests in punishing unlawful conduct and deterring its repetition." *Gore*, 517 U.S. at 568, 134 L. Ed. 2d at 822, 116 S. Ct. at 1595; *State Farm*, 538 U.S. at 416, 155 L. Ed. 2d at 600, 123 S. Ct. at 1519. Punitive damages have been described as "private fines," intended to deter future wrongdoing as well as punish a defendant. *Cooper Industries, Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424, 432, 149 L. Ed. 2d 674, 684, 121 S. Ct. 1678, 1683 (2001). Not surprisingly, fashioning appropriate punitive awards in furtherance of these goals can be difficult in certain situations.

Here, defendant's conduct was reprehensible based upon the fact that it was intentional and malicious. However, defendant's conduct of false picketing, while malicious, was not nearly as egregious as sexual harassment or wrongful prosecution. *Deters v. Equifax Credit Information Services, Inc.*, 202 F.3d 1262 (10th Cir. 2000) (sexual harassment); *Jones v. Rent-A-Center, Inc.*, 281 F. Supp. 2d 1277 (D. Kan. 2003) (sexual harassment)*; Routh Wrecker Service, Inc. v.*

*Washington*, 335 Ark. 232, 980 S.W.2d 240 (1998) (defendant wrongfully accused and swore out an arrest warrant against plaintiff for a crime he did not commit). Moreover, the award by the appellate court would result in disparity between the compensatory damages suffered by plaintiff and the punitive damages awarded at a ratio of almost 75 to 1. These facts do not end the analysis, however. In fact, the majority acknowledges that there is no bright-line ratio to follow when considering the disparity between the actual harm suffered by a plaintiff and the punitive damages awarded and explains that courts have considered a variety of other factors in fashioning punitive awards. Slip op. at 20-21, 25. Despite this, the majority focuses too greatly on the size of the ratio, fails to adequately utilize the other factors courts consider in fashioning punitive awards, and loses sight altogether of the underlying goals of punitive damages.

While the United State Supreme Court has stated that "few awards exceeding a single-digit ratio between punitive and compensatory damages *** will satisfy due process," there is no bright-line ratio and courts consider a variety of factors when departing from single-digit ratios. *State Farm*, 538 U.S. at 425, 155 L. Ed. 2d at 605-06, 123 S. Ct. at 1524. Where compensatory damages are inadequate to give victims any incentive to sue and thus insufficient to deter and punish defendants, punitive awards with high ratios are more appropriate. *Mathias v. Accor Economy Lodging, Inc.*, 347 F.3d 672, 676-77 (7th Cir. 2003). Such awards are also more appropriate where a defendant's wealth enables it to mount such an extremely aggressive defense that plaintiffs never bring suits in the first place. *Mathias*, 347 F.3d at 677. In these situations the extreme litigation costs imposed by the defendant's practices and the potential difficulty these costs impose on a plaintiff's ability to find a lawyer willing to fight in a case of modest stakes make high-ratio punitive awards more appropriate. *Mathias*, 347 F.3d at 677. Similarly, high-ratio awards are more appropriate where the attorney fees expended in a case are especially great. *Lowe Excavating Co. v. International Union of Operating Engineers Local No. 150*, 327 Ill. App. 3d 711, 724-25 (2002), citing *E.J. Mckernan Co. v. Gregory*, 252 Ill. App. 3d 514, 535-36 (1993).

While the majority identifies these factors, it does not appear to actually utilize them in concluding that a punitive damages award of $325,000, at a ratio of approximately 75 to 1, is unconstitutionally

excessive, while an award of $50,000, at a ratio of 11 to 1, is reasonable and constitutional. Although the majority's analysis and resulting 11 to 1 ratio award make clear its belief that this is a situation where an award exceeding a single-digit ratio between punitive and compensatory damages meets the requirements of due process, the majority's $50,000 award is not sufficient to achieve the punishment and deterrence purposes of punitive awards. Simply providing any double-digit ratio does not prove, in and of itself, an appropriate consideration of all the factors courts must utilize in finally setting an award.

This case has been going on since February 17, 1988, when plaintiff first filed suit. The compensatory damages plaintiff was able to establish amounted to only $4,680. Its attorney fees were much greater. When plaintiff filed its original motion for punitive damages on August 15, 2003, it attached affidavits of its company president as well as its attorneys. The company president's affidavit provided that plaintiff had, at that point, paid $225,925.83 in fees and expenses on the case. The attorneys' affidavits provided that fees and expenses actually totaled over $500,000.

These facts make evident that this is a situation where, under similar circumstances, compensatory damages may be too inadequate to give a victim an incentive to sue in the first place, and thus insufficient to punish and deter a defendant. Additionally, this case provides a strong example of a situation where, without a significant punitive award, extreme litigation costs could make it difficult for a plaintiff to find a lawyer willing to fight for such modest stakes. In fact, in making its findings concerning punitive awards, the trial court in this case specifically stated that it considered "the small amount of actual damages awarded to the Plaintiff, the additional harm to the Plaintiff caused by the Defendant's actions which caused the Plaintiff to be involved in protracted litigation and to expend substantial amounts for attorney's fees." Finally, the attorney fees expended by plaintiff in this case are unquestionably high.

Considering the above, and despite the flaws identified by the majority in the appellate court's analysis of the *Gore* and *State Farm* factors, I do not feel that a punitive award of $50,000 goes far enough. While an award of $325,000 leads to a high ratio between punitive and compensatory damages, it does provide an amount truly informed by the facts of this case and the underlying goals of punitive

damages. Like the majority, I would therefore not strictly adhere to a single-digit ratio. Having found this a situation appropriate for a double-digit award ratio, I would go further than the majority to appropriately punish defendant for its intentionally malicious conduct as well as deter it and others from considering similar courses of conduct in the future. Similarly situated potential plaintiffs must know that they will receive adequate compensation to justify filing suit in these types of cases, or to offset the extreme litigation costs occasioned by overly and wrongfully aggressive defendants. Upholding the appellate court's punitive damages award of $325,000 would accomplish these tasks and truly reflect a consideration of the factors which courts utilize in fashioning high-ratio punitive to compensatory awards.