2020 IL App (1st) 191771-U

No. 1-19-1771

Order filed December 30, 2020

Third Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT
_____

| | | |
|---|---|---|
| WILLIAM C. HUGHES, | ) | |
| | ) | |
|     Plaintiff and Counterdefendant-Appellee, | ) | |
| | ) | Appeal from the |
| v. | ) | Circuit Court of |
| | ) | Cook County. |
| CREATIVE PROPERTIES, INC. and NOEL | ) | |
| SCHUMANN, | ) | No. 12 CH 29331 |
| | ) | |
|     Defendants. | ) | Honorable |
| | ) | Raymond W. Mitchell, |
| (Noel Schumann, individually and derivatively on behalf | ) | Judge Presiding. |
| of Creative Properties, Inc., and ASA, Inc., | ) | |
| | ) | |
|     Counterplaintiffs-Appellants). | ) | |

_____

    JUSTICE BURKE delivered the judgment of the court.
    Presiding Justice Howse and Justice Ellis concurred in the judgment.

## ORDER

¶ 1    *Held*:  We affirm the judgment of the circuit court over counterplaintiffs-appellants' contentions that the trial court erred in not ordering counterdefendant-appellee to forfeit his compensation as a result of his breach of fiduciary duty, that the court erred in finding no breach of fiduciary with respect to ASA, Inc., and that the court erred in determining the amount of compensatory and punitive damages.

¶ 2    This case comes before this court following the circuit court's entry of a judgment awarding counterplaintiffs-appellants Noel Schumann, individually and derivatively on behalf of Creative Properties, Inc., and ASA, Inc. (collectively, "Schumann"), compensatory and punitive damages based on counterdefendant-appellee William Hughes' "repeated" breaches of fiduciary duty. The evidence adduced at trial showed that Hughes and Schumann were business partners having co-owned two business, ASA, Inc. (ASA) and Creative Properties, Inc. (CPI). After Hughes filed a complaint in the circuit court seeking to have Schumann purchase his 50% share in CPI, Schumann discovered a decade-spanning scheme whereby Hughes and one of the company's vendors, Simpson Ringer, had been surreptitiously inflating CPI invoices and returning the inflated sums directly to Hughes ("kickback scheme").

¶ 3    After discovering the kickback scheme, Schumann filed a counterclaim alleging, *inter alia*, that Hughes had breached his fiduciary duty by engaging in the kickback scheme and seeking an order requiring Hughes to forfeit his compensation from ASA and CPI, awarding Schumann compensatory damages, and assessing punitive damages against Hughes, among other relief. Based on the documentary evidence presented and the testimony of Ringer, Schumann, Hughes, and others, the court entered an order finding that there was "no doubt" Hughes had breached his fiduciary duty while he and Schumann owned CPI and that such breach caused injury to Schumann and CPI. The court found no breach of fiduciary duty, however, with regard to ASA. The court therefore awarded Schumann compensatory damages of $3,750 and punitive damages of $18,750, but declined to forfeit Hughes' compensation from ASA and CPI.

¶ 4    On appeal, Schumann contends that the court erred in not ordering Hughes to forfeit the compensation paid to him during the period of his breaches of fiduciary duty at CPI. Schumann further contends that the court erred in finding that Hughes did not breach his fiduciary duties

during the time he and Schumann owned ASA, thereby entitling Schumann to forfeiture of Hughes' compensation from ASA. Finally, Schumann contends that the court erred in awarding her $3,750 in compensatory damages and $18,750 in punitive damages. Schumann maintains that based on the evidence presented, she should have been awarded more than $20,000 in compensatory damages and 10 or 11 times that amount in punitive damages.

¶ 5                                    I. BACKGROUND

¶ 6     The record shows that in 1992, Hughes and Schumann founded ASA, a closely held corporation in the display advertising industry. Hughes and Schumann were each 50 percent shareholders of the business. In 1994, Hughes and Schumann formed Creative Displays, Inc. (Creative Displays), which was subsequently renamed CPI. Hughes and Schumann were each 50 percent shareholders of CPI. In December 1998, Hughes and Schumann, through CPI, purchased a building located at 115-119 Green Street in Bensenville, Illinois (the "Building") for $322,290. In order to purchase the Building, both Hughes and Schumann borrowed approximately $161,000 from ASA. Initially, ASA was the sole tenant of the Building, but eventually CPI rented space in the building to other tenants. CPI's sole business was leasing the Building. In November 1999, Schumann sold her 50 percent share in ASA to Hughes. Hughes sold his interest in ASA in 2002 to a third party.

¶ 7     In July 2012, Hughes filed a complaint for declaratory relief, injunctive and other relief, and for damages. In his complaint, Hughes asserted that he and Schumann, as 50 percent shareholders of CPI, were "deadlocked" and, as a result, the business of the corporation, leasing the Building, could no longer be effectively maintained. Hughes sought an order from the court requiring the parties to sell the Building and to require Schumann and CPI to purchase his 50 percent share of CPI. Schumann filed a motion to dismiss and Hughes filed amended complaints,

which Schumann also sought to dismiss. The parties subsequently agreed to list the Building for sale, resolving the claims in Hughes's complaint.

¶ 8    In October 2014, however, Schumann, individually and derivatively on behalf of CPI, filed a counterclaim asserting that while Hughes was a shareholder, officer and director of CPI, he personally took payments from vendors of CPI in exchange for CPI's business. Schumann further asserted that by participating in this kickback scheme, Hughes breached his fiduciary duty to the corporations, and Schumann sought damages resulting from that breach. Schumann subsequently filed an amended counterclaim adding allegations of Hughes's fraudulent conduct with regard to ASA dating back to the inception of the company in 1992. Schumann also alleged that Hughes had entered into improper side agreements with the Building's tenants regarding rent payments and potential buyouts of CPI's interest in the Building. The amended counterclaim sought an order requiring Hughes to forfeit his compensation from ASA and CPI, awarding Schumann compensatory damages, and assessing punitive damages against Hughes, among other relief. Schumann also filed a third party complaint against Ringer and his wife, Hilda Ringer (Hilda), in connection with their role in the kickback scheme, but that complaint was eventually voluntarily dismissed.

¶ 9    Schumann testified that she first learned of the kickback scheme in 2014 when Ringer, who had performed maintenance work and other labor for both ASA and CPI, contacted her and told her about the illicit payments. A few weeks later, Schumann met with Ringer and Hilda at their home where Ringer told her additional information about the kickback scheme and Hilda provided her with the Ringers' check register, which purported to show kickback payments to Hughes. Schumann testified that Ringer told her that Hughes had been conducting the kickback scheme for over 40 years, since Hughes and Ringer first started working together in the 1970s. Schumann sent

herself contemporaneous emails of her conversations with the Ringers, detailing the substance of their conversations. In the emails, she noted that Ringer told her that Hughes "probably" owed her more than $20,000 as a result of the kickback scheme.

¶ 10    Ringer testified at two separate depositions regarding the kickback scheme. At his first deposition, he denied any knowledge of a kickback scheme and asserted that he had never paid any kickbacks to Hughes. Following his first deposition, however, Ringer submitted an affidavit recanting his deposition testimony. In his affidavit, Ringer averred that his relationship with Hughes started in the 1970s when Ringer worked for Elwood Industries (Elwood), which was also in the display advertising industry, and Hughes worked at Creative Displays.[1] While Ringer was working at Elwood, Hughes requested that Ringer inflate the amounts charged in Elwood's invoices issued to Creative Displays and return the inflated sums directly to him. Ringer discussed this idea with his boss, who agreed to pay the inflated amounts to Hughes in order to keep his business.

¶ 11    After Ringer left Elwood, he started his own business, Ringer Machinery and continued to work with Hughes. Ringer performed services for Hughes and Schumann when they first started ASA in the early 1990s. Hughes continued to request that Ringer inflate invoices and make side payments to him. Ringer averred that he issued inflated invoices to ASA and CPI "[i]n exchange for Hughes' continued issuance of work/purchase orders to me." Ringer inflated invoices and made side payments to Hughes for "decades." Hughes requested that Ringer make side payments to him on "virtually every invoice" that he issued to CPI. Hughes would sometimes direct Ringer on how to phrase the invoices and how much to kickback on the side. Ringer averred that "nearly all" of

---

[1]This incarnation of Creative Displays appears to be a precursor to the Creative Displays founded by Schumann and Hughes in 1994, which eventually became CPI.

the side payments were made to Hughes in cash, but some were made via personal check. Ringer further averred that Hughes engaged in a similar kickback scheme "with numerous other vendors over the decades," including vendors that supplied goods and services to CPI.

¶ 12     At his second deposition, Ringer affirmed the statements made in his affidavit and testified that his testimony at the first deposition regarding the kickback scheme was not accurate. He testified that he did not give truthful testimony at his first deposition because he feared retaliation from Hughes. However, he decided to give the affidavit and the second deposition because he "just wanted to be honest." He testified that he told Schumann about the kickback scheme in 2014 because he was mad at Hughes for asking him to move his tools out of the Building despite the fact that Ringer was sick.

¶ 13     Ringer testified that his best estimate of the total amount paid to Hughes at CPI through the kickback scheme was "$4,000 or $5,000 at the most." Ringer acknowledged, however, that he "probably" told Schumann in 2014 that Hughes owed her "way more" than $20,000 as a result of the kickback scheme. Ringer testified that Schumann's contemporaneous emails of their conversations were accurate. Ringer testified that he did not keep records of the kickbacks or explicitly identify them on invoices or checks, so it was not possible to determine the total amount he paid to Hughes, but he testified that it "wasn't a whole lot of money." Ringer could not estimate the amount of kickbacks paid to ASA because he was working for Elwood at the time and he was not the owner of Elwood. Ringer testified that other vendors told him that they were also paying side payments to Hughes, and identified "Mack Chicago" as one such vendor.

¶ 14     Andrew Deniston testified that he purchased Elwood in 1986 and owned it during Ringer's employment with the company. He denied paying any kickbacks to Hughes and denied knowledge of anyone else at Elwood paying kickbacks to Hughes.

¶ 15    Hilda testified consistently with Ringer's testimony. Hilda co-owned Ringer Machinery with Ringer and performed bookkeeping and payroll services for the business. Following Ringer's 2014 meeting with Schumann, Hilda provided Schumann with the business's check register and allowed her to make copies of the checks.

¶ 16    Hughes denied any kickback scheme with Ringer or any other vendor. He testified that no one performed maintenance work for ASA prior to 1999, when Schumann sold her shares in ASA to Hughes, because ASA was located in an office building that had its own maintenance staff. He testified that Ringer did not do any work for ASA prior to ASA moving into the Building and that Ringer did not do any work for CPI until 2002. He acknowledged that ASA worked with Elwood, but testified that Ringer stopped working for Elwood in 1988, before ASA was formed. He further testified that he never paid back the $161,000 ASA loaned to him to purchase the Building for CPI because he and Schumann agreed as part of the ASA stock purchase price that the loan would be forgiven.

¶ 17    Hughes also testified regarding a stock purchase agreement with one of the Building's tenants, Jusein Mustafov.[2] Under the agreement, Mustafov paid Hughes $1,000 per month in return for Hughes preventing CPI from selling the Building. Hughes cashed at least two of the $1,000 checks Mustafov sent him pursuant to this agreement and Hughes did not share those amounts with Schumann. Hughes also sold furniture belonging to CPI for $500 and did not share the proceeds of the sale with Schumann.

---

[2]In its written order, the trial court spelled Mustafov's name "Mustavo," and counterplaintiffs-appellants variously refer to him as "Mustavo" and "Mustafu." However, based on the record, his name appears to be "Mustafov."

¶ 18    Following trial, the circuit court issued its ruling in a written order. The court found that Ringer's testimony, along with the documentary evidence and Hughes's own testimony represented credible evidence that Hughes had breached his fiduciary duty to CPI and Schumann. The court found that the evidence showed that Ringer would perform maintenance work for CPI and inflate his invoices at Hughes' direction. Ringer would then pay the inflated amount directly to Hughes, who did not disclose the payments to Schumann. The court further found that there was evidence that Hughes entered into side agreements with tenants of the Building for his own personal benefit. In particular, the court identified the evidence of the stock purchase agreement between Hughes and Mustafov, and Hughes' sale of CPI furniture.

¶ 19    The court found that there was "no doubt" that Hughes' breaches of fiduciary duties proximately caused injury to Schumann and CPI, but noted that the parties disagreed about the amount of damages. The court noted that Ringer testified he paid Hughes "[m]aybe $4,000 or $5,000 at the most" in kickbacks while the parties owned CPI. The court acknowledged that Ringer admitted he told Schumann in 2014 that he believed Hughes owed her more than $20,000, but the court found that amount was "purely speculative." The court further found that the evidence did not establish that "Hughes breached a fiduciary duty or caused damages to ASA, Inc. or Schumann arising from the period of time in which they both owned an interest in ASA, Inc." As such, the court found no damages with respect to ASA. The court concluded that the damages to CPI were $7,500, which included the kickback scheme, the side agreement with Mustafov, and the sale of CPI furniture. The court noted that because the parties were 50 percent shareholders in CPI, Schumann's damages were therefore $3,750.

¶ 20    With regard to punitive damages, the court noted that Schumann sought five times the compensatory damages as punitive damages. The court found that the evidence showed that

Hughes engaged in "intentional and ongoing breaches" of his fiduciary duty. The court concluded that there was ample evidence showing that Hughes acted willfully, secretively, and without cause and found that his conduct warranted punitive damages of $18,750, five times the amount of the compensatory damages.

¶ 21    With regard to forfeiture of Hughes' compensation from CPI, the court found that not every breach of fiduciary duty requires forfeiture. The court found that although Hughes' breach of fiduciary duty was willful and deliberate, the damages resulting from the breach were modest. The court found that, therefore, forfeiture was not warranted because, in light of the punitive damages awarded, it would not advance the purpose of depriving Hughes of gains and deterring future disloyalty. This appeal follows.

¶ 22                                    II. ANALYSIS

¶ 23    On appeal, Schumann contends that the court erred in its calculation of the amount of the damages awarded to Schumann and CPI. Schumann asserts that the court erred in not ordering Hughes to forfeit his CPI compensation as a result of his breaches of fiduciary duty. Schumann also contends that the court erred in finding that Hughes did not breach his fiduciary duty to ASA during the time he and Schumann co-owned ASA. Finally, Schumann asserts that the court erred in awarding compensatory damages of $3,750 and punitive damages of $18,750 where the evidence presented showed that she was entitled to a greater damage award.

¶ 24                        A. Forfeiture of CPI Compensation

¶ 25    Schumann first contends that the court erred in not finding that Hughes should forfeit his CPI compensation as an element of the damages. Schumann asserts that Illinois law requires forfeiture of all compensation when a party's breach of fiduciary duty is willful and deliberate. Schumann maintains that the court's decision to not award forfeiture damages because the amount

of damages was modest and would not advance the purpose of depriving Hughes of gains and deterring future disloyalty was contrary to Illinois law.

¶ 26    Schumann essentially contends that Illinois law *requires* forfeiture of compensation where a fiduciary's breach of duty is both willful and deliberate as the trial court found here. In support of that contention, Schumann relies on *Tully v. McLean*, 409 Ill. App. 3d 659 (2011) and *ABC Trans National Transport Inc. v. Aeronautics Forwarders, Inc.*, 90 Ill. App. 3d 817 (1980), among other authority. However, as the trial court recognized, these cases involved a breach of fiduciary duty by an agent to a principal. This court has found forfeiture was warranted in such cases because during the period of the beach, "the agent's services are not being 'properly' performed." *ABC Trans National Transport*, 90 Ill. App. 3d at 838. On the contrary, this court has recognized that where there is a breach of fiduciary duty by a controlling shareholder, complete forfeiture is *not* warranted. See *Graham v. Mimms*, 111 Ill. App. 3d 751, 768 (1982). The court in *Graham* based this decision in part due to the fact that the shareholder made efforts developing opportunities for the business and was entitled to reasonable compensation for those efforts. *Id.* Here, the record shows that Hughes made efforts developing opportunities for CPI during the periods he was receiving kickbacks and thus was entitled to reasonable compensation for those efforts.

¶ 27    Furthermore, this court has recognized that "[t]he appropriate remedy for breach of fiduciary duty to a principal is within the equitable discretion of the court." *LID Associates v. Dolan*, 324 Ill. App. 3d 1047, 1071 (2001) (citing *In re Marriage of Pagano*, 154 Ill. 2d 174, 190 (1992)). In *Pagano*, our supreme court stated that "[w]hile the breach may be so egregious as to require the forfeiture of compensation by the fiduciary as a matter of public policy [citation], such will not always be the case." *In re Marriage of Pagano*, 154 Ill. 2d at 190. The court continued that while forfeiture and punitive damages are *permissible* in certain circumstances, they are not

"automatic." *Id.* Here, the court found that Hughes' breach of fiduciary duty was deliberate and willful and went on for years. However, the court found that forfeiture was not warranted because the damages resulting from the breach were "modest" and the award of compensatory damages and punitive damages was sufficient to remedy the breach in this case. Thus, the trial court found that the breach was not "so egregious as to require the forfeiture of compensation" (*Pagano*, 154 Ill. 2d at 190) and such a decision was within the equitable discretion of the court (*LID Associates*, 324 Ill. App. 3d at 1071).

¶ 28    The trial court's decision to not grant forfeiture in this case is further supported when we examine the purpose of forfeiture. "The purpose of ordering forfeiture of a fiduciary's compensation earned during the period of a breach is not to compensate the injured party but rather to deprive the wrongdoer of the gains from the breach of duty and to deter [future] disloyalty." *Tully*, 409 Ill. App. 3d at 681. In this case, the gains from Hughes' breach of duty were not related to his compensation from CPI, but were instead related to service arrangements with third party vendors. The court deprived Hughes of the gains from his breach of fiduciary duty by awarding compensatory damages and deterred future disloyalty by awarding punitive damages. The court explicitly found that although punitive damages and forfeiture damages were not mutually exclusive remedies, the award of compensatory and punitive damages had already served the purposes of forfeiture. As such, forfeiture damages in this case would not serve the purpose of depriving Hughes of the gains from his breach and deterring future disloyalty. Accordingly, we find that the trial court did not err in not ordering forfeiture of Hughes's compensation.

¶ 29                    B. Breach of Fiduciary Duty ASA

¶ 30    Schumann next contends that the court erred in finding that Hughes did not breach his fiduciary duty with respect to ASA. Schumann asserts that Ringer's testimony demonstrated that

Hughes engaged in the kickback scheme for decades, including while Hughes and Schumann owned ASA. Schumann maintains that it is incongruous for the court to credit Ringer's testimony regarding the kickback scheme with regard to CPI, but to discount his testimony with regard to ASA. Schumann asserts that the court should have ordered Hughes to forfeit the entirety of his ASA compensation as a result of his breach of fiduciary duty. Schumann also contends that the $161,000 Hughes borrowed from ASA to purchase the Building, but never repaid, should also be considered part of his compensation from ASA, and should be forfeited.

¶ 31    Setting aside the principles of forfeiture of compensation discussed above, we find that the trial court's conclusion that Hughes did not breach his fiduciary duty with respect to ASA was amply supported by the record. A chronology of the events helps illustrate this point. The record shows that in the 1980s and 1990s, Ringer worked at Elwood.[3] Ringer testified that Hughes requested kickbacks while he was at Elwood, but Ringer acknowledged that since he was not the owner of Elwood, he did not personally pay the kickbacks to Hughes during that time, and that he was not aware of any amounts paid to Hughes during that time. The owner of Elwood during that period, Deniston, testified at his deposition that he did not pay any kickbacks to Hughes and he was not aware of anyone else at Elwood who paid kickbacks to Hughes. Hughes and Schumann founded ASA in 1992. ASA was a "display advertising sales promotion company." After Ringer left Elwood at some point in the early or mid-1990s, he started his own company, Ringer Machinery, which was a "handyman maintenance" company. Ringer testified that he continued to do work for Hughes and ASA and paid kickbacks to Hughes at his request, but he did not identify any work he performed and there was no evidence of checks or invoices paid during that time.

---

[3]Hughes testified that Ringer was fired from Elwood in 1988, but Ringer's testimony from his deposition suggests that he worked at Elwood through the "mid-1990s."

Schumann testified that Ringer worked for ASA from the "very beginning," but she did not know what services he performed for ASA and acknowledged that there were no records or invoices from that time period. Hughes testified that ASA did not hire anyone to perform maintenance between 1992 and 1999 because it was a tenant in office buildings that had their own maintenance staffs. Hughes only testified that he worked "with" Ringer from 1986 to 1990, before he and Schumann formed ASA.

¶ 32    Hughes and Schumann formed Creative Displays, which became CPI, in 1994 and purchased the Building in December 1998. ASA moved into the Building as the sole tenant in either December 1998 or sometime in 1999 before CPI started leasing to other tenants. In November 1999, Schumann sold her 50 percent share in ASA to Hughes. Thus, the only period of time during which ASA could have hired Ringer and Ringer Machinery to perform "handyman maintenance" services for ASA, was during the period between when ASA moved into the Building in December 1998 or 1999 and when Schumann sold her shares in ASA in November 1999. However, there is no testimony or documentary evidence showing Ringer performed any services for ASA at all, let alone during that relatively brief time period. As noted, Ringer testified that he performed services to ASA and paid kickbacks to Hughes while at ASA, but neither he, nor any other witness, offered evidence regarding what those services were, when they took place, or how much was paid. There is also the suggestion that Ringer was involved in paying kickbacks to Hughes at ASA while Ringer worked at Elwood. Again, this leaves only a small timeframe, from 1992 to the "mid-1990s," in which such kickbacks could have occurred. However, Ringer acknowledged that he was not directly involved in paying the kickbacks while at Elwood and Deniston denied paying any kickbacks to Hughes. Thus, the uncertain timeline combined with the lack of any definitive evidence in the form of invoices, checks, or even definitive testimony

regarding what services were performed, when they were performed, and the amount, if any, of kickbacks paid during that time period, support the trial court's conclusion that the testimony and documentary evidence failed to demonstrate that Hughes breached his fiduciary duty while at ASA.

¶ 33    Schumann asserts, however, that the reason the evidence regarding the kickback scheme is vague is because, as Ringer testified, the majority of the kickbacks were paid in cash and there were no records of the amounts paid. Schumann contends that where the amount of damages is uncertain, the court may award nominal damages and then award punitive damages. See *In re Estate of Hoellen*, 367 Ill. App. 3d 240, 252 (2006). However, "nominal damages are a trivial sum of money awarded to a litigant who has established a cause of action but has not established that he is entitled to compensatory damages." *Id.* n.3 (citing Restatement (Second) of Torts § 907 (1979)). In this case, as discussed, Schumann has not established a cause of action with regard to Hughes' breach of fiduciary duty to ASA.

¶ 34    Nonetheless, Schumann maintains that the court failed to address the "shifting burden of proof" of a fiduciary. Schumann asserts that after she raised claims regarding the propriety of Hughes' various acts, the burden shifted to Hughes to prove by clear and convincing evidence that the acts were fair and proper and did not breach his fiduciary duty. The record shows that Hughes clearly failed to satisfy this burden with respect to his actions at CPI, but Schumann asserts that Hughes also failed to satisfy this burden with respect to ASA. Schumann is correct that "[w]here a fiduciary relationship exists and a transaction is entered into, the defendant has the burden to show by clear and convincing evidence that the subject transaction was equitable and just." *Hassan v. Yusuf*, 408 Ill. App. 3d 327, 348 (2011). In this case, however, it is not clear from the evidence presented that a transaction was ever "entered into" with Ringer while Hughes and Schumann both

owned ASA. As noted, the evidence of whether and when Ringer did any work for ASA was vague and uncertain. Although Schumann maintains that Ringer performed services for ASA based on Ringer's testimony and her own testimony, neither was able to identify what that work may have been, when it took place, what was paid, and the amount, if any, of any kickbacks that were paid during that period. Hughes, for his part, only acknowledged that he worked "with" Ringer from 1986 to 1990, but denied hiring Ringer to perform maintenance at ASA and denied receiving any kickback payments during that period. It would be impractical for the court to require Hughes to defend the propriety of such vague and uncertain "transactions." Accordingly, based on the evidence presented, we find that the trial court did not err in finding that Hughes did not breach his fiduciary duty to ASA.

¶ 35                              C. Compensatory Damages

¶ 36    Schumann next contends that the court erred in awarding her compensatory damages of $3,750. Schumann asserts that the evidence showed that Ringer told her in 2014 that Hughes owed her at least $20,000, and that Ringer testified that the kickback scheme went on for decades. Schumann maintains that the best evidence of the actual amount of the kickbacks was Ringer's 2014 confession and the court erred in crediting Ringer's deposition testimony that the amount paid in kickbacks was only "$4,000 to $5,000 at the most."

¶ 37    This court will reverse a trial court's award of compensatory damages only if it is against the manifest weight of the evidence. *Bell Leasing Brokerage, LLC v. Roger Auto Service, Inc.*, 372 Ill. App. 3d 461, 473 (2007). "A trial court's ruling is against the manifest weight of the evidence only if it is unreasonable, arbitrary and not based on the evidence, or when the opposite conclusion is clearly evident from the record." *In re Estate of Michalak*, 404 Ill. App. 3d 75, 96 (2010). Schumann, however, advocates for a more relaxed standard of review because the majority of the

evidence in this case derived from depositions, affidavits, and documentary evidence. Schumann contends, citing *Muhammad v. Muhammad-Rahmah*, 363 Ill. App. 3d 407, 414 (2006), that this court may afford less deference to the trial court's findings where this court is in "as good a position" to review the evidence as the trial court. Schumann does not define precisely what this more relaxed standard of review would entail and nor did the court in *Muhammad*. What is clear, however, is that even under a more relaxed manifest weight standard, this court will accept the view of the trier of fact as long as it is reasonable, even if there are different ways to view the evidence or if alternative inferences may be drawn from the evidence. *People ex rel. Illinois Historic Preservation Agency v. Zych*, 186 Ill. 2d 267, 278 (1999). That is because it is not the function of this court to reweigh evidence, and it is therefore irrelevant whether we may have reached a different result if we were the trier of fact. *Id.*

¶ 38    Here, Ringer testified at his deposition that he paid Hughes "$4,000 or $5,000 at the most" in kickbacks. The trial court specifically cited this testimony when determining the amount of the compensatory damages. Schumann contends that the court erred in crediting this testimony rather than Ringer's purported statement in 2014 that Hughes owed Schumann more than $20,000 as a result of the kickback scheme. Schumann recorded that amount in her contemporaneous emails detailing her conversations with Ringer and Ringer testified that those emails were accurate. Schumann contends that the $20,000 figure is more consistent with Ringer's testimony that the kickback scheme lasted for decades and included "virtually" every invoice. The predicament with Schumann's assertions is twofold. First, as the trial court recognized, Ringer's 2014 assertion that Hughes owed Schumann more than $20,000 did not appear to be based on anything more than speculation. Ringer did not explain how he determined that number, whether that number applied to only CPI or to Ringer's entire business relationship with Hughes—which Ringer testified began

in the 1970s—or whether that amount was even based on Ringer's personal knowledge. Crucially, Ringer directly contradicted that statement at his deposition testifying that he paid Hughes only $4,000 to $5,000 at the most. When counsel asked Ringer if he told Schumann in 2014 that Hughes owed her more than $20,000, he testified that he "probably" told her that, but he did not change his testimony regarding the $4,000 to $5,000 amount.

¶ 39    Secondly, although, Ringer testified that he paid kickbacks to Hughes for years and that he inflated "most" or "virtually every" invoice, there is absolutely no evidence of how many invoices or kickbacks were paid. Ringer testified that he would kickback a portion of the invoices, usually between $25 to $100, to Hughes and several checks and invoices entered into evidence appeared to detail these payments. As noted, however, aside from these checks and invoices, there is simply nothing other than Ringer's testimony to demonstrate the total amount paid to Hughes. It is unknown whether this scheme involved dozens of invoices or hundreds or thousands. What is clear, however, is that Ringer testified that the total amount paid in kickbacks "wasn't a whole lot of money." This is more consistent with his testimony that the total amount was $4,000 to $5,000, rather than the "more than $20,000" that Schumann seeks. Accordingly, we find the trial court's determination of the amount of compensatory damages was not against the manifest weight of the evidence.

¶ 40                                D. Punitive Damages

¶ 41    Finally, Schumann contends that the trial court erred in awarding punitive damages of $18,750. Schumann asserts that the court should have considered her attorney fees in the calculation of the punitive damages and asks for punitive damages of 10 or 11 times the amount of compensatory damages, rather than five times as the trial court awarded.

¶ 42    The decision whether to grant punitive damages and the amount of the award is reviewed for abuse of discretion. *Gambino v. Boulevard Mortgage Corp.*, 398 Ill. App. 3d 21, 51, 69 (2009). "The assessment of punitive damages is a highly factual decision, which is appropriately made at the trial court level." *Id.* at 69. We find that the trial court did not abuse its discretion in determining the amount of the punitive damages.

¶ 43    Initially, we observe that during closing argument, Schumann's counsel stated, "I would suggest five times compensatory damages for punitive damages." Indeed, in issuing its decision, the trial court noted that "Schumann sought five times compensatory damages in punitive damages" while Hughes argued for less then four times. The court's award of $18,750 in punitive damages is five times the amount of compensatory damages, which demonstrates that the court accepted Schumann's argument on this matter. Schumann now contends, however, that this amount of punitive damages was inadequate and the court should have awarded 10 or 11 times the compensatory damages as punitive damages. Schumann's contentions in this regard are akin to invited error. Under that doctrine, a party is prohibited from requesting that the court proceed in one manner and then arguing on appeal that the requested action was in error. *Gaffney v. Board of Trustees of the Orland Fire Protection District*, 2012 IL 110012, ¶ 33. In this case, Schumann requested punitive damages of five times compensatory damages, which the trial court granted. It would be manifestly unfair for Schumann to now contend that such action was erroneous. See *id.*

¶ 44    Nonetheless, Schumann maintains that the amount of punitive damages was inadequate because the court did not consider Schumann's substantial attorney fees in determining the amount of the damages. Schumann contends, citing *International Union of Operating Engineers, Local 150 v. Lowe Excavating Co.*, 225 Ill. 2d 456 (2006), that the court may consider attorney fees when awarding punitive damages. Schumann contends that her attorney fees in this matter are significant

because of the protracted length of the litigation and that the court should have considered the amount of her fees in determining the amount of punitive damages.

¶ 45 However, in *Lowe*, the supreme court reduced the amount of punitive damages awarded from $325,000 to $50,000. *Id.* at 490. The supreme court did so despite the fact that the litigation lasted nearly a decade. *Id.* at 459-63. The supreme court recognized that "the $50,000 awarded here does not come close to covering the attorney fees and costs which were incurred throughout the duration of this protracted litigation," but nonetheless found the amount of punitive damages awarded by the trial court was excessive. *Id.* at 491. The court found that "[w]hile attorney fees can be considered when awarding punitive damages, it is not within the purview of this court to award such fees outright, nor should they be awarded under the guise of a punitive damages award." Id. Thus, the *Lowe* decision is clear that while the court may consider attorney fees in its award of punitive damages, it is not required to set an amount of damages to compensate the prevailing party for its attorney fees, nor may it award a party attorney fees under the "guise" of a punitive damages award. Rather, the goal of punitive damages is "punishment and deterrence." *Id.* at 490. In this case, that trial court found that Hughes' breaches of fiduciary duty were willful and deliberate. However, it also found that the amount of damages caused by his breaches was "modest." The court therefore found that punitive damages of five times the amount of the compensatory damages, as requested by Schumann at trial, served the punishment and deterrence purpose of punitive damages. We cannot say based on the evidence presented that such a determination was an abuse of discretion.

¶ 46                                III. CONCLUSION

¶ 47 For the reasons stated, we affirm the judgment of the circuit court of Cook County.

¶ 48 Affirmed.